NOT DESIGNATED FOR PUBLICATION

No. 125,858

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DEJUAN EARL SWEET,
*Appellant*.


MEMORANDUM OPINION

Appeal from Leavenworth District Court; DAVID J. KING and GERALD R. KUCKELMAN, judges. Oral argument held March 5, 2024. Opinion filed May 17, 2024. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Steven J. Obermeier*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.


Before GREEN, P.J., HILL and CLINE, JJ.


PER CURIAM: Dejuan Earl Sweet appeals from his conviction and sentence related to several crimes involving an attempt to collect a debt. He argues that the State failed to present sufficient evidence to support his convictions for aggravated burglary and aggravated child endangerment. He contends that the district court erred in instructing the jury and by improperly receiving the jury verdict. He contends that the State committed prosecutorial error during closing argument. He also argues that cumulative error deprived him of a fair trial. He asserts that the district court erred when a substitute judge

1

read the jury verdict. And he claims that his sentence for aggravated burglary is illegal. For the reasons set forth in this opinion, we affirm his conviction and sentence.

FACTS

On March 26, 2022, Dejuan Sweet and Davonn Parson went to collect a $200 debt that Tyson Williams owed to Sweet. Sweet and Williams had known each other for most of their lives, having grown up and attended school together. But Williams had been refusing to pay the $200 he owed Sweet for a pair of shoes Sweet sold him four months earlier. Sweet testified that he wanted to pick up the $200 dollars and then eat lunch at IHOP with Parson.

*The preparation*

Sweet and Parson arrived at Williams' apartment in Leavenworth, Kansas, around noon. Parson testified that he knocked on the door and then Sweet put on a COVID mask and winter gloves before entering the apartment. Sweet testified that Parson was wrong about the mask, stating that he already had the mask on. But he admitted that he put the gloves on just before entering the apartment.

Several people were in the apartment with Williams. Williams was in the living room while his pregnant girlfriend, Elizabeth Enriquez, was elsewhere in the apartment. Elizabeth's sister, Marissa Enriquez, was on the couch in the living room with her boyfriend, Tyler Smith, and their 10-month-old daughter, R.M.S., and Elizabeth's daughter, F.S.H., Elizabeth, and Marissa's father, Larry Enriquez, was also in the apartment.

*The confrontation*

Marissa told Williams that there was somebody knocking at the door. When Williams answered the door, he saw Parson first and recognized him from playing basketball. Williams said to Parson, "'I told you all to text or call me before you come over.'" Testimony diverges on how Parson and Sweet entered the apartment. Parson testified as follows, "[Sweet] pushed past me and open the door, like push the door open." But Sweet testified as follows, "[Williams] opens the door real wide. [Parson] walks in and I walk in right behind [Parson]." Williams testified that Sweet "just like kind of forcefully just comes into the door."

Neither Williams nor anyone else invited Parson and Sweet to come in. Williams told them to leave. Marissa testified that Sweet walked in "kind of like" he did not want Williams to know that he had a gun, using his hand and body position to obscure the gun. Elizabeth came out of the bathroom, stood in front of Parson and Sweet, and told them to leave. The group started yelling at each other about money.

Smith noticed that Sweet had a gun and asked about it, pointing out that children were present. Smith then picked up his daughter R.M.S. and moved her toward a bedroom. Marissa called 911.

*The gun*

Testimony slightly conflicts about where Sweet pointed his gun. Parson testified that Sweet drew the gun, pointed it at Williams, then Elizabeth, then at the other male in the room, apparently Smith, who was holding a child. Marissa testified that Sweet drew his gun as soon as Smith pointed out that Sweet had the gun. Marissa testified that Sweet pointed the gun at Smith and Smith was holding R.M.S. at the time. Smith testified similarly, explaining as follows, "[Sweet] turns around and looks at me and aims the gun

3

at me and my daughter," with his finger on the trigger. According to Marissa, when Smith took R.M.S. to the bedroom, Sweet pointed the gun at Williams instead.

But Williams testified that Sweet "points it at Elizabeth because she was in front of me, and then he raised it at me." Williams did not recall Sweet ever pointing the gun at Smith. Elizabeth testified that Sweet pointed the gun first at Smith, then at herself, then at Williams. Sweet testified that he did not point his gun at anyone.

Parson twice told Sweet, "'Hand me the gun. Don't do nothing that you won't regret.'" Williams testified that he told Sweet, "'Put the gun away so we can just fight.'" Sweet testified that he only took the gun out of his pocket to hand it to Parson and never pointed it at anyone. Sweet handed the gun to Parson, who put it in a fanny pack. Then Sweet and Williams got into a fistfight.

Sweet testified that he went to the apartment intending to ask for money but was caught off guard by how aggressively Williams responded. Sweet explained as follows:

> "And I'm talking to [Williams] about where's the money, can I get my money. And [Williams] was yelling at me, and he's being aggressive towards me. And then [Elizabeth] comes in from the kitchen in front of [Williams]. And when that happens, [Williams] is trying to move [Elizabeth] from—from—from in front of him.
>     "And when I seen [*sic*] that, I had the gun in my pocket, and I took it out of my pocket and trying to hand it to [Parson]. And—because he was trying to come towards me, and I knew I had a gun in my pocket, and I didn't want to wrestle him or fight him with a gun in my pocket.
>     "So I gave the gun off to [Parson]. [Williams] pushes [Elizabeth] out of the way, comes toward me. I hit [Williams] with my right hand. That's how [Williams] got the mark on his face.
>     "Then when I hit [Williams], he falls backwards, and I try to go towards him, and I got pushed from behind. And then it's just been a fight from there."

4

Sweet also testified that he never intended to pull out the gun he was carrying, he only intended to get his $200 and that he would have left without incident if he had gotten the $200.

*The fight*

As Sweet and Williams were fighting, they fell on Elizabeth's daughter, F.S.H. Elizabeth testified that the fall hurt F.S.H.'s leg, adding the following, "So she was crying a little bit, but I think she was scared more than anything." Elizabeth shoved at the men to get them off F.S.H., then she pushed F.S.H. under a table, and shielded F.S.H. with her body.

Elizabeth's father, Larry, also intervened in the fight, but testimony on his intervention is diverse. Parson testified that Larry intervened directly in the fight by grabbing Sweet by the neck. Williams, however, testified that Larry "grabs [Sweet] and gets him off of me." On the other hand, Elizabeth testified that Larry put Sweet in a chokehold. But Marissa testified that Larry's focus was on getting F.S.H. out of the way of the fight and into a bedroom, not intervening in the fight.

Elizabeth went with Larry to put F.S.H. in the bedroom. When she came back to the kitchen where she could see the fight, Parson was in the doorway. His hand was in the fanny pack that contained the gun. He warned her not to get involved and implied he would use the gun. Parson told Larry to let go of Sweet, stating, "'Take your hands off his neck [before] I have to up this bitch.'"

*The flight*

Marissa's 911 call continued while the fight was happening. The fight ended when Sweet and Parson heard police sirens. Parson testified that Sweet ran out of the apartment

first. Parson stated that he was confused, did not know what to do, and just followed Sweet out of the apartment. Parson ran from police as they arrived and threw the gun into a trash can.

Officer Austin Dyche chased Parson, eventually finding him seated on the front porch of a house roughly two blocks away trying to catch his breath. Dyche took Parson into custody. After Dyche interviewed everyone in the apartment, he retraced his steps from the foot chase to search for dropped evidence, finding the fanny pack with the loaded gun inside.

The State charged Sweet with aggravated burglary, in violation of K.S.A. 2021 Supp. 21-5807(b)(1), battery, in violation of K.S.A. 2021 Supp. 21-5413(a)(1), three counts of aggravated assault, in violation of K.S.A. 2021 Supp. 21-5412(b)(1), and two counts of aggravated endangering a child, in violation of K.S.A. 2021 Supp. 21-5601(b)(1). At the end of trial, the jury deliberated from 9:22 a.m. until a jury question at 10:37 a.m. and reached a verdict at 11:14 a.m. The jury acquitted Sweet of aggravated assault of Elizabeth, but it convicted him of the remaining charges. The district court imposed a controlling sentence of 77 months (6 years, 5 months) in prison.

Sweet timely appeals.

ANALYSIS

I. *Did the State present sufficient evidence to support a conviction for aggravated burglary?*

Sweet argues that the evidence shows he went to Williams' apartment intending to demand his money, which is not a crime. Thus, he contends that the State failed to show the intent element required for aggravated burglary. The State argues that the jury

6

properly inferred from circumstantial evidence that Sweet intended to commit aggravated assault when he entered Williams' apartment.

Our standard of review for sufficiency of the evidence is as follows:

"'When the sufficiency of the evidence is challenged in a criminal case, we review the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses.'" *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021).

"This is a high burden, and only when the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt should we reverse a guilty verdict. [Citations omitted.]" *State v. Meggerson*, 312 Kan. 238, 247, 474 P.3d 761 (2020).

On the count of aggravated burglary of a dwelling, the district court instructed the jury as follows:

"To establish this charge, the State must prove each of the following claims:
"1. The defendant entered a dwelling.
"2. The defendant did so without authority.
"3. The defendant did so with the intent to commit an aggravated assault therein.
"4. At the time the defendant entered the dwelling, there was a human being therein."

Sweet notes that the aggravated assault required that he intended to put someone "'in reasonable apprehension of immediate bodily harm'" from a deadly weapon. Sweet asserts that the State failed to show that he intended to commit an aggravated assault when he entered Williams' apartment:  "[Sweet's] intent when entering the apartment was to collect the $200 that [Williams] owed him."

7

Sweet and the State both present flawed arguments on appeal, making it necessary to separate some wheat from chaff. The State takes issue with Sweet's discussion of the COVID mask and asserts that one method of committing aggravated assault is "while disguised in any manner designed to conceal identity." K.S.A. 2021 Supp. 21-5412(b)(2). But Sweet was not charged with concealed identity aggravated assault. Further, the evidence does not support a concealed identity. Williams testified that he immediately recognized Parson when he opened the door, with no testimony that Parson was masked at all. And Sweet, whom Williams knew his whole life, pushed past and into the apartment. The evidence does not show that Sweet concealed his identity or even intended to. The State adds that Sweet's gloves would not have left fingerprints on the gun but fails to explain how the gloves would conceal his identity from Williams. The State's departure here from the acceptable facts is entirely a non sequitur.

Sweet also discusses the gloves, making a separate flawed contention:

> "There was no witness testimony that [Sweet] wearing a mask and gloves put them in fear of immediate bodily harm. . . . Nor did the [S]tate provide any evidence to show or support the inference that [Sweet] put on gloves with the intent to put people in the apartment in fear of immediate bodily harm as opposed to simply keeping his hands warm in March."

But Sweet sets up a straw man here. See *State v. Brown*, 263 Kan. 759, 762, 950 P.2d 1365 (1998); *In re Marriage of Monslow*, 259 Kan. 412, 426, 912 P.2d 735 (1996). This fallacy is committed by one who erects a "straw man" to represent an opposing argument, and then striking that argument down. Here, this argument is fallacious because the argument knocked down here (that Sweet put on gloves with the intent to put people in the apartment in fear of immediate bodily harm) is not an argument that the State had made.

Indeed, the State's contention at trial and on appeal was not that Sweet used the gloves to put people in fear of immediate bodily harm, but that he donned the gloves to draw his gun and used the gun to put people in fear of harm. Sweet skips from gloves to fear, omitting the crucial component of the State's argument. Further, the evidence does not support Sweet's implication that he intended to keep his hands warm because he did not put them on until he was about to enter the apartment.

Sweet focuses largely on the evidence with citations to the record to make his argument about the sufficiency of the evidence. The State offers a case citation, but its value is limited. Intent does not need to be and rarely can be proven through direct evidence. *State v. Thach*, 305 Kan. 72, 82, 378 P.3d 522 (2016). Jerry Thach broke into his victim's home along with three other men to commit aggravated battery. On appeal, Thach argued that the State overshot the mark at trial by asserting that he entered the home intending to commit murder. The evidence at trial established that Thach and his cohorts planned to beat up the victim. 305 Kan. at 84. But the case is dissimilar because no evidence showed that Thach entered with another intent—a lawful one—such as collecting $200 that the victim owed. The State presents no case factually analogous to this one, where evidence of the defendant's intent was similarly ambiguous.

Setting aside weaknesses in the parties' arguments, the crucial question that the evidence at trial needed to answer was simple. Did Sweet intend to commit aggravated assault when he entered the apartment? If he entered the apartment intending to point his gun at someone, then he committed aggravated burglary based on the jury instructions. If he did not intend to point his gun at anyone but simply intended to demand $200, then he did not commit aggravated burglary based on the jury instructions.

Certainly, some evidence undercuts the State's contention that Sweet entered the apartment intending to commit aggravated assault. Sweet entering the apartment with his gun drawn and pointed would have been very strong evidence that he intended to point

9

his gun at someone. All the testimony seemed to agree that Sweet did not enter the apartment with his gun already drawn and pointing his gun at someone, or even with the gun in hand. The jury's question seems directed at whether Sweet entered the apartment with intent to commit aggravated assault, even though his weapon was not drawn. The jury asked the following question: "What is the State's definition of authority to enter the home and aggravated assault not with a weapon?" Sweet directly testified that he did not intend to use his gun and intended to only demand $200, adding that he would have left if he had gotten his money. No direct evidence or testimony directly contradicts Sweet's testimony.

Some evidence is ambiguous. Marissa testified that Sweet turned his body to keep Williams from seeing the gun and helped obscure the gun with his hand. This testimony could support Sweet's contention that he intended to keep the gun out of play, or it could weigh in favor of Sweet intending to surprise Williams with the gun. But the significance of this testimony was for the jury to decide.

Finally, Sweet donned his gloves as he waited for someone to answer the door. As the State notes in its brief, the gloves would not leave fingerprints. While the gloves would not conceal Sweet's identity from Williams, the jury could consider this as evidence that Sweet intended to handle the gun. The jury had some evidence before it from which to conclude that Sweet intended to commit aggravated assault.

In short, Sweet fails to show that no reasonable fact-finder could find guilt beyond a reasonable doubt, requiring reversal. See *Meggerson*, 312 Kan. at 247. Evidence needs to relate to the assertion made and both parties point to evidence outside the narrow question of whether Sweet intended to point his gun at anyone when he entered the apartment. Cut bait is not evidence of a caught fish. Sweet argues that he intended to ask for only money, leaving the jury open to interpret his acts of carrying a gun and donning

10

gloves as preparation for a potential confrontation, not an intent to assault with a deadly weapon.

But Sweet's argument relates to the relative strength and weakness of the evidence, and the weight given to it during the jury's two-hour deliberation. Based on the conviction, the jury must have given little or no credit to Sweet's testimony that he intended to ask for money and then leave. The jury must have construed the use of gloves and the attempt to conceal the gun as evidence that Sweet intended to point the gun at someone when he entered the apartment. Sweet's appeal on this issue amounts to an invitation for us to reweigh the evidence, which is beyond the scope of our review. Because we cannot reweigh evidence presented to the jury, we affirm Sweet's conviction for aggravated burglary.

II. *Did the district court clearly err by not instructing the jury on the lesser included offense of assault?*

Sweet argues that an instruction on assault was legally and factually appropriate and the district court's failure to instruct the jury on assault was clear error requiring reversal. The State argues that the lesser included offense instruction was not factually appropriate because the evidence could lead to a conviction only on aggravated assault—that is, Sweet either committed the assault with a deadly weapon or he committed no assault at all.

When the giving of or failure to give a lesser included offense instruction is challenged on appeal, appellate courts apply the analytical framework for jury instruction issues. See *State v. Gray*, 311 Kan. 164, 173, 459 P.3d 165 (2020). Appellate courts follow a multi-step process when reviewing challenges to jury instructions:

> "'First, it considers the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; next, it applies unlimited review

to determine whether the instruction was legally appropriate; then, it determines whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and finally, if the district court erred, this court determines whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012).'

"However, if a defendant fails to object to the instructional error below, the clear error standard is applied to assess prejudice. Instructional error is clearly erroneous when '"the reviewing court is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred."' [Citations omitted.]" *State v. Owens*, 314 Kan. 210, 235, 496 P.3d 902 (2021).

When evaluating whether a lesser included instruction is factually appropriate in the individual case, courts use the following test: "Is there some evidence when viewed in the light most favorable to the defendant that would allow a rational factfinder to find the defendant guilty of the lesser included offense?" *State v. McLinn*, 307 Kan. 307, 324-25, 409 P.3d 1 (2018); see K.S.A. 22-3414(3).

The trial judge shall instruct the jury as to the crime charged and any lesser included crime in cases where there is some evidence that would reasonably justify a conviction of some lesser included crime. K.S.A. 22-3414(3).

Neither party argues whether an assault instruction was legally appropriate, leaving only the question of the unrequested instruction's factual appropriateness. See *State v. Berkstresser*, 316 Kan. 597, 601, 520 P.3d 718 (2022) ("The State chose not to dispute that an instruction for the misdemeanor crime would have been legally appropriate, so our focus is drawn to factual appropriateness."); cf. *State v. Nelson*, 224 Kan. 95, 97, 577 P.2d 1178 (1978) ("A simple assault is a lesser included offense of aggravated assault with a deadly weapon."). Kansas appellate courts review factual appropriateness de novo. *State v. Love*, 305 Kan. 716, 736, 387 P.3d 820 (2017).

Our Supreme Court has clarified that analysis of factual appropriateness does not begin with examining the elements of the greater offense. *State v. Lowe*, 317 Kan. 713, 720, 538 P.3d 1094 (2023) (citing *Berkstresser*, 316 Kan. at 604). In *Berkstresser*, the panel reviewed the elements of felony fleeing or attempting to elude a police officer. The panel noted that it contained one element more than misdemeanor fleeing: reckless driving. The panel looked to whether some evidence showed Berkstresser did not drive recklessly—that is, whether the element which elevates the offense to a felony was missing. Our Supreme Court held that this was error and the panel should have limited its analysis to deciding whether the evidence supported the four elements of misdemeanor fleeing or eluding. 316 Kan. at 604.

Similarly, in *Lowe*, our Supreme Court held that the panel erred when holding: "'There was no evidence presented to show that Lowe committed a simple assault, meaning an assault without the vehicle.' [Citation omitted.]" 317 Kan. at 720. This court errs if it begins with the aggravated offense and removes the aggravating element. Instead, appellate analysis must focus on the lesser included offense in isolation.

K.S.A. 2021 Supp. 21-5412(a) defines assault as "knowingly placing another person in reasonable apprehension of immediate bodily harm." The record contains sufficient evidence to support a jury's verdict that Sweet knowingly placed another person in reasonable apprehension of immediate bodily harm. It is unnecessary to consider—and indeed error to consider—whether Sweet placed another person in reasonable apprehension of immediate bodily harm *absent* the aggravating element of a deadly weapon. See *Lowe*, 317 Kan. at 720.

The jury should have been given the option of choosing between assault and aggravated assault, even if Sweet did not request the lesser instruction. See *State v. Roberts*, 314 Kan. 835, 852, 503 P.3d 227 (2022) (holding that a district court has a duty to provide a legally and factually appropriate instruction); *State v. Williams*, 303 Kan.

13

585, 599, 363 P.3d 1101 (2016) (holding that a lesser included offense instruction is not foreclosed even if it is inconsistent with either the evidence presented by the defendant or the defendant's theory of the case).

The district court erred by instructing only on aggravated assault, not assault. The next question is whether the failure to give the unrequested instruction is reversible error under K.S.A. 22-3414(3).

Here, the jury rejected Sweet's version of events. He denied pointing his gun at anyone, instead handing the gun directly to Parson. The jury's question during deliberation was directed at the aggravated burglary charge, clarifying whether Sweet's intent when entering the apartment could relate to an aggravated assault that did not involve the gun. The jury's convictions of aggravated assault against Williams and Smith, but not Elizabeth Enriquez, indicate that the jury believed Sweet pointed his gun at two people but not a third. The jury carefully analyzed whether the evidence supported the pointing of a deadly weapon at each victim individually. Nothing in the record establishes that the jury would have reached a different result, especially given the jury's credibility determinations and attention to detail in the testimony. Because Sweet cannot firmly convince this court that the jury would have reached a different verdict, we affirm.

III. *Did the State present sufficient evidence to support a conviction for aggravated child endangerment?*

Sweet argues that the record contains insufficient evidence to support his convictions for aggravated child endangerment. The State argues that Sweet knew the children were present and his actions endangered the life, body, or health of the children.

Sweet argues that two elements of aggravated child endangerment were not supported by the evidence. First, Sweet asserts that it is not enough for the State to show

14

a reasonable probability that a child will be injured; rather, the State must show that a child is injured or almost certain to be injured to sustain a conviction for aggravated child endangerment. Second, Sweet asserts that the State did not show he acted recklessly—consciously disregarded a substantial and unjustifiable risk—because he was not aware that children were present.

*The probability of injury*

Aggravated endangering a child is "[r]ecklessly causing or permitting a child under the age of 18 years to be placed in a situation in which the child's life, body or health is endangered." K.S.A. 2021 Supp. 21-5601(b)(1). The district court instructed the jury that the State had the burden to show that Sweet "recklessly caused or permitted" R.M.S. and F.S.H. "to be placed in a situation in which . . . life, body, or health was endangered" to establish the charges of aggravated endangering of a child. The State argued to the jury that Sweet committed aggravated child endangerment when he pointed the gun at Smith while Smith held R.M.S. The State argued that Sweet also committed aggravated child endangerment when Sweet and Williams fell on F.S.H. during their fight.

On appeal, Sweet argues that there must be a difference between child endangerment under K.S.A. 2021 Supp. 21-5601(a) and aggravated child endangerment under K.S.A. 2021 Supp. 21-5601(b)(1). He notes that the lesser offense has a higher culpable mental state—child endangerment requires knowing conduct while aggravated child endangerment requires only reckless conduct. K.S.A. 2021 Supp. 21-5601(a), (b). The parties make different arguments for each of the two children involved.

*The risk to R.M.S.*

The jury heard testimony that Sweet pointed a gun at Smith, who was holding R.M.S. at the time. Sweet argues that there must be a sufficiently definite dividing line between child endangerment and aggravated child endangerment for appellate courts to determine sufficiency of the evidence. He asserts that the State must show more than a reasonable probability or likelihood that a child will be injured. Instead, Sweet claims the State meets its burden by showing that the child is injured or almost certain to be injured. He contends that pointing the gun near R.M.S. did not rise to the level of almost certainly injuring her.

Sweet supports his theory of a dividing line between child endangerment and aggravated child endangerment with *State v. Fabre*, No. 100,081, 2009 WL 1911696 (Kan. App. 2009) (unpublished opinion). Joseph Frank Fabre argued that the two levels of child endangerment were identical, asserting that the phrase "'may be . . . endangered'" from the child endangerment definition was functionally the same as the phrase "'is . . . endangered'" from the aggravated child endangerment definition. 2009 WL 1911696, at *6. Sweet reads *Fabre* as distinguishing between child endangerment and aggravated child endangerment based on the probability or likelihood of the threat.

But Sweet misreads *Fabre* or misstates its holding. The *Fabre* court concluded by discussing "the omission of the unreasonableness element" from aggravated endangering a child. 2009 WL 1911696, at *7. Child endangerment was intentionally exposing a child "to situations where the child *may be* injured or endangered *only if such an act is unreasonable*." 2009 WL 1911696, at *7. Aggravated child endangerment does not contain the specification that the act is unreasonable. See K.S.A. 2021 Supp. 21-5601(b)(1). The *Fabre* court reasoned that—to convict a defendant of aggravated child endangerment—the jury must decide that the threat is real and actual such that the act of exposing the child to that threat is inherently unreasonable. Thus, the dividing line laid

16

out by the *Fabre* court was inherently unreasonable exposure to danger versus the jury questioning whether the exposure was reasonable or unreasonable.

Sweet similarly cites *State v. Hansford*, No. 109,105, 2014 WL 1707455 (Kan. App. 2014) (unpublished opinion). But the *Hansford* court quoted the reasonableness analysis of the *Fabre* court approvingly. The *Hansford* court adopted the same stance that an act's inherent unreasonableness contributed to the act being aggravated child endangerment rather than the lesser offense. 2014 WL 1707455, at *4.

Regarding R.M.S., the State cites *State v. Martinez*, No. 108,441, 2014 WL 3731888 (Kan. App. 2014) (unpublished opinion). The *Martinez* court reviewed testimony from Damaris Tarango that Rogelio Martinez, Jr. pointed a gun at Tarango's two-year-old daughter. The *Martinez* court held as follows:

> "Certainly, pointing a loaded firearm at a child during a robbery constitutes a reasonable probability that harm to the child will result. Firearms are extremely dangerous instruments with the ability to cause instant death. Pointing a loaded gun at an individual immediately places that individual in danger. Based on Tarango's testimony, a rational jury could have found Martinez guilty beyond a reasonable doubt, *i.e.*, Martinez caused M.L. to be placed in a situation in which her life, body, or health was endangered." 2014 WL 3731888, at *7.

Although one panel of this court is not bound by the opinion of another panel, the reasoning of *Martinez* is sound. The facts of this case are similar enough to *Martinez* that the persuasive authority is on point. Based on the testimony of Smith and others that Sweet pointed the gun at Smith and R.M.S., a rational jury could have found Sweet guilty beyond a reasonable doubt.

*The risk to F.S.H.*

Sweet also argues that he did not create a reasonable probability or likelihood that F.S.H. would be injured. No evidence showed that Sweet pointed a gun at F.S.H. Instead, the evidence establishes that Sweet had a fistfight with Williams and the two men fell on F.S.H. On appeal, Sweet points to Elizabeth's testimony that F.S.H. was unhurt. Elizabeth testified that it seemed like the fall hurt F.S.H.'s leg, adding the following:  "[B]ut I think she was scared more than anything." Sweet's argument fails for two reasons. First, the evidence that F.S.H. did not sustain an actual injury is not the same thing as F.S.H. not being in danger of injury. In plain language, it could have been worse. F.S.H. may not have sustained actual injury to her leg or elsewhere, but the possibility existed at the moment the two men toppled over and fell on F.S.H. Second, the fall was not the end of it. The jury heard evidence that the fight continued and that one or more adults had to remove F.S.H. from the room to prevent her from being injured. Combined, the evidence shows that F.S.H. was endangered.

*Awareness that children are present*

Sweet also argues that the State failed to prove the mens rea or mental culpability element of aggravated child endangerment. Sweet asserts that he could only act recklessly—with conscious disregard to a substantial and unjustifiable risk—if he knew that the children were present and therefore at risk. See K.S.A. 2021 Supp. 21-5202(j). Sweet points out that "[Sweet] testified that he did not see any children while in the apartment, and the record does not include any evidence that [Sweet] necessarily would have been aware of children in the apartment." But on this point, Sweet again asks this court to reweigh the evidence.

The jury was not bound to accept Sweet's testimony on his version of events. See *State v. Aikins*, 261 Kan. 346, 392, 932 P.2d 408 (1997). From the jury's verdict, it is

18

readily apparent that the jury did not believe Sweet's testimony that he was unaware of the children. The State correctly distinguishes this case from *State v. Herndon*, 52 Kan. App. 2d 857, 863-64, 379 P.3d 403 (2016). When Joey Herndon fired a .22 caliber rifle at Wanda Fry's pickup truck, he did not know her nine-year-old son was in the back. The evidence at trial did not directly show that Herndon knew Fry had a son. The evidence did not directly show that Herndon knew of any backseat passengers in the truck. The *Herndon* court refused to stack onto the rather questionable inference that Herndon knew Fry had a child the equally questionable inference that she must have had her child in the truck with her. 52 Kan. App. 2d at 864. Thus, the State acknowledges the similarity that Herndon and Sweet deny knowing of the presence of children, but the State correctly distinguishes this case on the other evidence.

Unlike in *Herndon*, other evidence establishes that Sweet must have known that children were present. Smith testified that he was holding R.M.S. while Sweet pointed a gun at him. While Herndon could not see the interior of a moving vehicle, Sweet here would have had a direct line of sight to Smith and the child in Smith's arms. Testimony established that Elizabeth Enriquez and Smith directly told Sweet that children were in the home. During the fistfight, Sweet and Williams fell and landed on F.S.H., causing her to cry. And Parson, who entered with Sweet, testified that he noticed two children in the apartment when they entered.

Thus, Sweet's argument invites this court to reweigh the evidence. He asks this court to give more weight than the jury did to his testimony that he did not notice the children. He asks us to disregard the jury's apparent conclusions: (1) that Sweet must have seen R.M.S. when he pointed a gun at the adult holding her and (2) that Sweet must have noticed F.S.H. when he landed on top of her and she started crying in what must have been a close proximity to his ear. A reasonable jury could conclude from the evidence available that Sweet knew of the presence of R.M.S. and F.S.H. and acted with conscious disregard of the risk to the children. See *Ford Motor Co. v. McDavid*, 259 F.2d

19

261, 266 (4th Cir. 1958) ("[I]t is the province of the jury to resolve conflicting inferences from circumstantial evidence."). Because the evidence supports the jury's verdict, we affirm.

IV. *Did the district court clearly err by not instructing the jury on the lesser included offense of child endangerment?*

Sweet argues that the district court should have instructed the jury on aggravated child endangerment and child endangerment. The State contends that omitting the lesser included charge was not reversible error.

Sweet argues that the line between child endangerment and aggravated child endangerment is ultimately a jury question: "Perhaps in some situation where a child receives actual and significant injuries, this Court couldn't be persuaded that the verdict would be different if the jury was given the option of a lesser-included offense." But from the evidence here, Sweet contends that support for the higher charge was not overwhelming and would not have necessarily compelled such a finding.

The State contends that the threats to R.M.S. and F.S.H. were real and actual. The State also asserts that Sweet recklessly exposed the children to a situation where they were endangered. See *State v. Pattillo*, 311 Kan. 995, 1018, 469 P.3d 1250 (2020). In *Pattillo*, Christopher Shawn Pattillo drove the van during a drive-by shooting. Brian Miller was killed, and a residence occupied by Miller's seven-year-old nephew was hit.

"Here, the evidence established that Pattillo's actions endangered the child's health, not just that he might have done so. Although not physically harmed, the child was receiving mental health treatment at the time of trial, and he told the jury about his anxiety arising from the incident. His mother testified he feared going outside and had heightened anxiety brought on by loud noises like fireworks.

20

"We are not firmly convinced the jury would have returned a different verdict had the judge instructed on endangering a child." 311 Kan. at 1018.

Similarly, the evidence showed that Sweet endangered R.M.S.'s health by pointing a gun toward her. The evidence shows that Sweet endangered F.S.H.'s body because the fistfight placed her in danger of injury, both from the men falling on top of her and from the fight continuing such that adults needed to move F.S.H. out of the way. Because Sweet cannot convince this court that the jury would have returned a different verdict, we affirm.

## V. *Did the State commit prosecutorial error during closing argument?*

Sweet argues that the State improperly vouched for facts and misstated facts during closing argument. He contends that the prosecutor's error requires reversal. The State argues that the prosecutor did not misstate facts and the prosecutor's use of the phrase "we know" was not improper vouching.

The appellate court uses a two-step process to evaluate claims of prosecutorial error:  error and prejudice. *State v. Sieg*, 315 Kan. 526, 535, 509 P.3d 535 (2022).

"To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there

21

is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]"
*State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

See also *State v. Fraire*, 312 Kan. 786, 791-92, 481 P.3d 129 (2021). The statutory harmlessness test also applies to prosecutorial error, but when analyzing both constitutional and nonconstitutional error, appellate courts only need to address the higher standard of constitutional error. *State v. Carr*, 314 Kan. 744, 764, 502 P.3d 511 (2022).

Even if the prosecutor's actions are egregious, reversal of a criminal conviction is not an appropriate sanction if the actions are determined to satisfy the constitutional harmlessness test. *Sherman*, 305 Kan. at 114. Courts may still use prosecutorial misconduct as a descriptor for more serious occurrences. *State v. Chandler*, 307 Kan. 657, 695, 414 P.3d 713 (2018) (finding prosecutor's conduct to amount to prosecutorial misconduct in addition to prosecutorial error).

The extent of any ameliorating effect of a jury admonition attempting to remedy a prosecutor's error must be considered in determining whether the erroneous conduct prejudiced the jury and denied the defendant a fair trial. *State v. Rhoiney*, 314 Kan. 497, 501, 501 P.3d 368 (2021); see *State v. Barber*, 302 Kan. 367, 383, 353 P.3d 1108 (2015).

Appellate courts will review a prosecutorial error claim based on a prosecutor's comments made during voir dire, opening statement, or closing argument even without a timely objection, but the court may figure the presence or absence of an objection into its analysis of the alleged error. *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021).

A district court has a duty to affirmatively act to punish and deter particularly egregious prosecutorial acts. Appropriate sanctions could include a referral of the attorney to the disciplinary office. In addition, courts should discharge their duty to

oversee the criminal justice system and ensure its integrity by issuing on the court's own motion orders to offending prosecutors, to be heard in separate proceedings, and to show cause why the prosecutor should not be found in contempt of court for the misconduct. *Sherman*, 305 Kan. at 114-15.

A prosecutor also errs when arguing a fact or factual inference without an evidentiary foundation. *State v. Watson*, 313 Kan. 170, 179, 484 P.3d 877 (2021).

*The "we know" statements by the prosecutor*

The first issue Sweet raises with the prosecutor's closing argument comes from his first statement during closing argument:

> "Ladies and gentlemen, March 26, 2022, the defendant committed seven crimes. He entered the home without permission of [Smith], [Williams], Marissa [Enriquez], and Elizabeth [Enriquez], with the intent to commit one of the aggravated assaults. *We know that* because he walked in with his hand hidden behind his back with gloves and with a mask on." (Emphasis added.)

Sweet complains of the italicized phrase, "[w]e know that," as improper vouching. The State contends that a prosecutor's use of "'we know'" is acceptable when it does not indicate the prosecutor's personal opinion but demonstrates that the evidence was uncontroverted. *State v. King*, 308 Kan. 16, 34, 417 P.3d 1073 (2018). The State asserts that the evidence was uncontroverted that Sweet walked in with gloves and a mask on.

Here, the State misreads the transcript. The prosecutor did not state the simple fact of Sweet wearing gloves and a mask. The prosecutor asserted that Sweet entered "with the intent to commit one of the aggravated assaults. *We know that* because" of the gloves and mask. (Emphasis added.) Thus, the prosecutor tied the element needed to be proven with the evidence that he hoped would support that element. Sweet wore gloves and a

mask, which was uncontroverted. The jury needed to determine whether the gloves and mask demonstrated the intent to commit aggravated assault. From this phrasing, it was the prosecutor and not the jury that drew this connection. See *King*, 308 Kan. at 31, 34-35 (holding that the use of "we know" may be permissible when summarizing uncontroverted evidence but is prosecutorial error when drawing inferences for the jury). The prosecution committed error during closing arguments.

The next step in the analysis is to determine whether the prosecutorial error prejudiced Sweet's due process rights to a fair trial. The State must show beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record—there is no reasonable possibility that the error contributed to the verdict. *Sherman*, 305 Kan. at 109. The State offers two other statements from the prosecutor's closing argument for their ameliorating effect.

First, the prosecutor stressed that the jury had to determine witness credibility. The prosecutor stated the following:

> "Now, remember that the credibility of witnesses—and you have this in the instructions—is for you to decide. We talked a lot about this in jury selection. You need to determine who was—like who you believe, whether it's the defendant or whether it's everyone else who testified.
> "You look at what they testified to. Why they testified, how they testify, how that compares to everything else, both other testimony and what was found. And you get to use your common sense to determine the credibility of people and how this evidence comes out.
> "So let's talk about it.
> "When we look at the victims and what they testified to, really what's being corroborated by everybody, including the defendant, the parties involved, the defendant, Parsons [*sic*], and all the victims are there."

But the State is incorrect that this statement during closing argument relates to the prosecutor's error. The prosecutor drew an inference from putting on gloves to intending aggravated assault. The credibility of witnesses is unrelated. Parson testified that Sweet put on the gloves while they waited for someone to answer the door. Assuming the jury credited Parson's testimony, it is still an open question as to why Sweet put on the gloves. The prosecutor erred by telling the jury what inference to draw from credible testimony. See *State v. Alfaro-Valleda*, 314 Kan. 526, 538-39, 502 P.3d 66 (2022). His discussion of determining whether testimony is credible does not correct the error. The two comments simply address two different, albeit related, questions.

But the State offers one more section of the prosecutor's closing argument for its ameliorating effect. During rebuttal, the prosecutor stated the following:

> "And the State argues that we've met that burden, that the defendant entered that home, gun behind his back, gloves on, mask on, pushes his way into the door; that when he does so he starts to argue with [Williams] about that $200 that he was going to get no matter what."

This statement aids the harmlessness analysis because of how it parallels the prosecutor's statement in *King*. Our Supreme Court held that the prosecutor erred by drawing the following inference for the jury: "'And *we know* that Dyron King was [at the Shamrock] because Brenden Foxworthy's blood is on his gray Nike boot that was recovered from his bedroom.'" (Emphasis added.) *King*, 308 Kan. at 34. But in analyzing harmlessness, the *King* court considered the effect of the prosecutor's more neutral statement during rebuttal presenting the same evidence more appropriately:

> "'In Dyron King's bedroom with a bunch of other large shoes, which you can see in the photos, are a pair of size 13 gray Nike boots. Those boots have the blood of Brenden Foxworthy on them. You can ask yourself and use your common knowledge and experience is that a coincidence?'" 308 Kan. 35-36.

25

The State has a more difficult time in this case than in *King* and *Alfaro-Valleda* of demonstrating harmlessness considering the evidence. In *King*, our Supreme Court cited the length and complexity of the case but more importantly the "voluminous evidence" which convinced the *King* court that the prosecutor's error did not contribute to the verdict. 308 Kan. at 36. In *Alfaro-Valleda*, our Supreme Court cited the ameliorating effect of the jury instruction that statements of counsel are not evidence, alongside the "most persuasive evidence" at trial of the defendant's statements that he knew the police had caught him and that he killed the victim to prove his love for his son's mother. 314 Kan. at 545-46. But the State does not point to direct evidence showing that Sweet entered with the intent to commit aggravated assault. Throughout its brief, the State argues that the jury properly inferred this intent from the circumstantial evidence.

But the jury demonstrated its scrutiny of this issue when it asked its question in the middle of deliberation: "What is the State's definition of authority to enter the home and aggravated assault not with a weapon?" The jury's question showed that the jury did not unquestioningly accept the prosecutor's inference that Sweet donned gloves and a mask because he intended to point a gun at someone. Instead, it is readily apparent that the jury revisited the issue afresh, deciding for themselves what the evidence demonstrated. This jury question—combined with the prosecutor's reframing in rebuttal and the district court's ameliorating instruction—show that prosecutorial error did not prejudice the jury. The jury arrived at their verdict independently of the prosecutor's error in claiming that "we know" Sweet intended aggravated assault when he put on his mask and gloves.

But Sweet offers additional claims of prosecutorial error. He asserts that the prosecution's closing argument contained misstatements of fact, namely, two inaccurate summations and one omission. While the prosecutor's use of "we know" was harmless but erroneous vouching, the three other statements Sweet complains of were not error.

26

*The prosecutor's discussion of finger on the trigger*

First, Sweet argues that the prosecutor misrepresented witness testimony on whether Sweet had his finger on the trigger of his gun when he pointed it.

> "We talked about the gun, who possessed it. Essentially everybody says the defendant possessed it. Then he handed it over to Parsons [*sic*]. They talked about it being a tan, kind of a military fatigue kind of color. It was a handgun, how it was used, that he pulled it out, that he pointed it at different people, and then he handed it to [Parson], and [Parson] put it in his backpack. They also talk about that he had his finger on the trigger. Every time he pointed it at somebody."

Sweet argues that the prosecutor's summary begins by saying all witnesses testified to seeing Sweet possessing a tan firearm and ends by saying all witnesses saw his finger on the trigger. This argument has one strength and two weaknesses. The strength of Sweet's argument is that not all witnesses claimed to have seen Sweet's finger on the trigger. Sweet asserts that only Smith, Williams, and the responding officer, Dyche, stated that Sweet had his finger on the trigger. On this point, Sweet's case is actually stronger than he makes it out to be. In fact, only Smith directly testified that Sweet had his finger on the trigger. During the investigation, Williams told police that Sweet's finger was on the trigger. But at trial Williams testified that he was sure Sweet's finger was on the trigger even though he was not looking at the trigger. Thus, Williams' statement that he directly saw Sweet's finger on the trigger came in through Dyche's testimony about arriving on scene and taking witness statements. Sweet correctly argues that Elizabeth, Marissa, and Parson did not testify about whether they observed Sweet's finger on the trigger.

The first weakness in Sweet's argument is that the prosecutor did not say that everyone's testimony was uniform. "Essentially everybody" is not the same as saying everybody. The second weakness is the span in between the phrase "[e]ssentially

27

everybody" and the referent "they." The prosecutor stated: "Essentially everybody says the defendant possessed it." This sentence accurately recaps the testimony. The next sentence, "[t]hen he handed it over to Parson[]," does not contain any caveat about everybody's testimony and is a statement which could be based solely on the testimonies of Sweet and Parson. From that point, it becomes less and less clear who is referred to by the word "they," and the final statement is ambiguous: "They also talk about that he had his finger on the trigger." This statement could mean witnesses discussed Sweet's finger on the trigger, with some confirming and others less certain. The prosecutor's statement could perhaps have been phrased better, but it did not rise to the level of mischaracterizing the evidence.

### *The prosecutor's discussion of pointing the gun at Smith*

Sweet also claims that the prosecutor inaccurately summarized testimony on the point of whether Sweet pointed the gun at Smith. Smith, Elizabeth, and Marissa directly testified that Sweet pointed the gun at Smith. Parson testified that Sweet pointed the gun at "[t]he male" who was holding a kid, instead of specifying Smith by name. But Williams did not recall Sweet ever pointing a gun at Smith. And Sweet denied pointing his gun at anyone.

During closing argument, the prosecutor summarized the issue of Sweet pointing the gun at Smith as follows:

> "The event, what's being corroborated there. Every witness told you that he forces his way into the home, that even [Williams] kind of got pushed back when they come to the home, but he pushes through the door. The defendant did that. Not [Parson]. That he demands money from [Williams]; that he points a gun at [Smith], [Williams], and Elizabeth [Enriquez]. And then he hands the gun to Parsons [*sic*]. They get in a fight, and then they run out of the home. That's corroborated by [Williams], [Smith], Marissa [Enriquez], and Elizabeth [Enriquez].

"So when we look at that, by whom. Who corroborates all this? Well, everybody kind of corroborates really what was testified to.

"The testimony for—that the defendant forced his way into the home, that he pulled out a gun, that he pointed it towards [Smith] and [R.M.S.], that he then pointed it to Elizabeth and then up towards [Williams], and then he handed it over to [Parson] comes from pretty much everybody.

"The only person that doesn't agree with that is the defendant himself. The defendant at that point in time just says, well, I just handed the gun over to [Parson]."

Sweet's argument fails because the prosecutor did not state the issue as definitively and unequivocally as Sweet characterizes. The prosecutor's hedging language is significant, specifically that "everybody *kind of* corroborates" the same events and that the testimony "comes from *pretty much* everybody." (Emphases added.) These phrases are appropriate given the overlap between testimonies as well as the distinctions.

In total, six witnesses discussed Sweet pointing the gun at Smith while he held R.M.S. Sweet is one of those witnesses, but the prosecutor disclaimed his testimony by stating the following: "The only person that doesn't agree with that is the defendant himself." The prosecutor made clear that the summation related to the testimonies of the other five witnesses: Parson, Smith, Williams, Elizabeth, and Marissa. Of those, only Williams did not recall Sweet pointing a gun at Smith. The other four out of five witnesses testified that Sweet pointed the gun at Smith, making it accurate for the prosecutor to state that the testimony came "from pretty much everybody." Also, the witnesses do not agree on all details, particularly the order. Parson testified that Sweet pointed his gun at Williams, then Elizabeth, then Smith. But Elizabeth reversed that order, testifying that Sweet pointed the gun at Smith, then herself, then at Williams. Thus, the prosecutor accurately stated that everybody "kind of" corroborated each other, excluding Sweet's testimony.

29

*Smith's involvement in the fight*

Finally, Sweet makes one last claim of prosecutorial error. This claim is based on an omission. Smith testified that, once he removed R.M.S. from harm's way, he came back to try to break up the fight between Sweet and Williams. But Elizabeth testified that Smith was never involved in any part of the fight. Thus, Sweet argues it was prosecutorial error to state that witness testimony was consistent because two witnesses directly contradicted each other.

As the State correctly notes, Smith's involvement in the fight was not an element of any crime. Neither party discussed this detail in closing argument. The prosecutor's statements about corroboration and consistency between the witnesses related to the main points, not ancillary matters unrelated to the charged crimes. The prosecutor did suggest that, overall, testimony was mainly consistent between Smith, Williams, Marissa, and Elizabeth. This suggestion was not inaccurate, nor did it misstate the evidence in the record. Because the prosecutor's statements in closing argument contained one harmless error, we affirm.

VI. *Was Sweet prejudiced by the substitution of a different judge for the sole purpose of accepting the jury's verdict?*

Sweet argues that a change of judges during jury deliberation constitutes reversible error. The State responds that Sweet was not prejudiced by the temporary substitution of judge solely for the ministerial act of receiving the jury's verdict.

Sweet claims that the district court violated K.S.A. 43-168. Statutory interpretation presents a question of law over which appellate courts have unlimited review. *State v. Betts*, 316 Kan. 191, 197, 514 P.3d 341 (2022).

After submitting the case to the jury, the Honorable David J. King stated he would be unavailable during a specific time for unspecified reasons. Judge King addressed the parties as follows:

"We're out of the presence of the jury. Defendant is present and Counsel's present. I need to advise the parties that I have a matter that I'm going to have to take up that I'm going to be unavailable essentially from 11:00 till noon. So if there's any further inquiry from the jury or they reach a verdict, Judge Kuckelman will come down and take it up rather than have to wait on me, okay?

"So if something happens between 11:00 and 12:00, just understand that Judge Kuckelman's going to come out, okay?"

The jury returned its verdict at 11:14 a.m. The district court addressed the jury as follows:

"Members of the jury, my name is Gerald Kuckelman, I'm one of the other District Judges here in Leavenworth County. Judge King had another commitment late morning and had to leave, and so I'm simply filling in for him."

Sweet asserts that the district court did not comply with the statutory procedure for substitution of judges. K.S.A. 43-168 provides the following:

"If by reason of death, sickness or other disability the judge before whom a jury trial has commenced is unable to proceed with the trial, another judge sitting in or assigned to the court in which the action is being tried, upon certifying that he has familiarized himself with the record of the trial, may proceed with and finish the trial."

Sweet contends that Judge Kuckelman erred because he did not certify that he had familiarized himself with the record. The State counters with two arguments. First, the State argues that the substitution of judge for the ministerial act of accepting the verdict was a mere technical defect that did not prejudice Sweet's rights. Second, Judge

31

Kuckelman was familiar with Sweet's case, having presided over Sweet's first and second appearance, preliminary hearing, bond hearing, bond revocation hearing, and pretrial; and Judge Kuckelman appointed counsel for Sweet as well as replacement counsel when the first attorney withdrew for health reasons. The State's second point does not comply with the plain language of the statute. K.S.A. 43-168 requires the substitute judge to certify familiarity with the record. The State does not show, or even claim, that the record contains such certification. Even if Judge Kuckelman was the judge presiding over the case for every hearing up until trial, he did not preside over trial and did not comply with the statute's requirement of certifying familiarity with the trial record.

If a judge fails to familiarize himself or herself with the record before substitution, a reviewing court must "assume prejudice unless the record shows beyond a reasonable doubt that no significant prejudice occurred." *State v. Boyd*, 27 Kan. App. 2d 956, 963, 9 P.3d 1273 (2000). There can be no prejudice to the defendant, however, if the substitute judge performs only ministerial acts. 27 Kan. App. 2d at 962.

Kansas courts have held that receiving a jury verdict is a ministerial act. See *Peterson v. State*, 203 Kan. 959, 965, 457 P.2d 6 (1969). No published case has determined that presiding over jury deliberations is also a ministerial act, although at least one unpublished case has: *State v. Brown*, No. 107,494, 2016 WL 1079444, at *9-10 (Kan. App. 2016) (unpublished opinion) (holding that presiding over jury deliberations is a ministerial act). Other states have held that presiding over jury deliberations is a ministerial act, and in some cases have extended this to include rereading the original jury instructions or answering jury questions, reasoning that the substitute judge did not perform any acts which required personal knowledge of the case. See, e.g., *People v. Moon*, 107 Ill. App. 3d 568, 574, 437 N.E.2d 823 (1982); *Gibson v. State*, 334 Md. 44, 50-51, 637 A.2d 1204 (1994); *People v. Lewis*, 71 A.D.2d 7, 11-12, 422 N.Y.S.2d 380 (1979). In states that found the substitution was reversible error, it was because the substitute judge performed some action which arguably required some knowledge of the

case. See, e.g., *State v. Gossett*, 11 Wash. App. 864, 871-72, 527 P.2d 91 (1974) (holding that it was error for the substitute judge to provide further instruction at the jury's request). Thus, the analysis of whether a judge's acts are ministerial turns on whether those acts required personal knowledge of the case.

Based on the facts of this case, Judge Kuckelman performed only a ministerial act. It was Judge King who submitted the case to the jury for deliberation. Judge King received the jury's question. Judge King formulated an answer to the jury's question. Although neither party objected to the form or content of Judge King's answer, it would have been Judge King who ruled on any such objection. Judge King became unavailable at 11 a.m., and the jury returned its verdict at 11:14 a.m. Judge Kuckelman was not called upon to rule on any objections or interact with the jury during those 14 minutes. Judge Kuckelman received the jury verdict and scheduled a sentencing hearing. Failure to strictly adhere to K.S.A. 43-168 does not prejudice the defendant when the substitute judge performs the ministerial act of receiving the verdict. *Peterson*, 203 Kan. at 965; *Brown*, 2016 WL 1079444, at *10. It is not even clear that K.S.A. 43-168 still applies to the proceedings once the jury has reached its verdict. See *State v. Atkinson*, No. 90,356, 2004 WL 1542324, at *6 (Kan. App. 2004) (unpublished opinion) ("[K.S.A. 43-168] is inapplicable under the circumstances of this case where the substituting judge took over after all evidence had been heard, closing arguments made, and jury deliberations were complete."). Because Judge Kuckelman's actions did not require any personal knowledge of the case or trial proceedings, his acts were ministerial. Sweet cannot show that he was prejudiced or that error, if any, requires reversal.

VII. *Did Sweet receive an illegal sentence?*

The State charged Sweet with aggravated burglary using language which did not conform to the language of the statute. K.S.A. 2021 Supp. 21-5807(b)(1) defines aggravated burglary as entering or remaining within any "[d]welling" in which there is a

human being intending to commit a felony, theft, or sexually motivated crime. K.S.A. 2021 Supp. 21-5807(b)(2) employs the phrase "other structure which is not a dwelling." From this dichotomy, it is readily apparent that our Legislature broke the set of all structures into two categories: structures which are dwellings and structures which are not.

The State's first amended complaint made the mistake of charging Sweet with aggravated burglary of "any structure or motor vehicle." Thus, it is not clear from the language of the complaint whether the State intended to charge Sweet under aggravated burglary of a structure which *is* a dwelling—under K.S.A. 2021 Supp. 21-5807(b)(1), a severity level 4 person felony under K.S.A. 2021 Supp. 21-5807(c)(2)(A)—or the State intended to charge aggravated burglary of a structure which is *not* a dwelling—under K.S.A. 2021 Supp. 21-5807(b)(2), a severity level 5 person felony under K.S.A. 2021 Supp. 21-5807(c)(2)(B). The State made the mistake of lumping together all structures, despite the Legislature's clear intent to separate them. Also, the complaint included "motor vehicle," and the term "vehicle" appears in yet another subsection: K.S.A. 2021 Supp. 21-5807(b)(3). But a charge of aggravated burglary of a motor vehicle has no relationship to the facts of this case or the evidence presented at trial.

Sweet contends that the facts charged in the complaint correspond to the severity level 5 offense under K.S.A. 2021 Supp. 21-5807(b)(2) or (b)(3). Sweet maintains that the use of the word "structure" in the complaint unambiguously refers to "other structure which is not a dwelling" as mentioned in K.S.A. 2021 Supp. 21-5807(b)(2). The reasoning behind this component of Sweet's brief did not become apparent until oral argument. From the statute's language, the word "structure" can refer to dwellings, but it can also refer to other structures which are not dwellings. Sweet refuses to accept that dwellings are structures. He ignores the context clue of "other structure which is not a dwelling" from K.S.A. 2021 Supp. 21-5807(b)(2) which breaks structures out into two categories: dwelling structures and nondwelling structures. Instead, Sweet constructs a

simple mental framework in which "dwelling" equates with (b)(1) and "structure" equates with (b)(2). From this, he concludes that the State charged Sweet under K.S.A. 2021 Supp. 21-5807(b)(2) because it used the word "structure" in the complaint, despite the State's citation to K.S.A. 2021 Supp. 21-5807(b)(1). Sweet is incorrect because the State's use of "structure" rendered the complaint ambiguous.

But Sweet correctly notes that the State at one point referred to the crime as a level 5 person felony. The State's initial complaint charged Sweet with aggravated burglary of "any structure" in violation of K.S.A. 2021 Supp. 21-5807(b)(1), a severity level 4 person felony. But later the State moved for leave to amend its complaint, stating the following: "The defendant is currently charged with one count of Aggravated Burglary, a level 5 person felony . . . ." And the amended complaint repeated the original complaint's use of "any structure," citing K.S.A. 2021 Supp. 21-5807(b)(1), specifying that it was a severity level 4 person felony. Sweet's record citations undermine his contention that the State unambiguously charged a level 5 person felony. Instead, he shows that the complaint was ambiguous, even to the State, about whether Sweet was charged with a level 4 or a level 5 person felony.

To compound the issue, the district court's order setting the case for trial stated that Sweet was arraigned on a level 5 felony, citing K.S.A. 21-5807(b), but without specifying whether he was charged under (b)(1) or (b)(2). Nothing in the record shows any discussion or ambiguity about whether the parties believed that the apartment Sweet entered was a dwelling. The jury heard evidence that Williams and others lived in the apartment—that is, it was a dwelling.

Most importantly, the jury was instructed on the elements of aggravated burglary as outlined in K.S.A. 2021 Supp. 21-5807(b)(1). The jury instructions referred to Count 1 as "Aggravated Burglary of a Dwelling." The district court used the language of K.S.A. 2021 Supp. 21-5807(b)(1) when it instructed the jury as follows:

35

"To establish this charge, the State must prove each of the following claims:

"1.  The defendant entered a dwelling.

"2.  The defendant did so without authority.

"3.  The defendant did so with the intent to commit an aggravated assault therein.

"4.  At the time the defendant entered the dwelling, there was a human being therein."

The evidence presented was of a dwelling. The jury was instructed to determine whether the structure was a dwelling. The language of the jury instruction conformed to K.S.A. 2021 Supp. 21-5807(b)(1). The jury found beyond a reasonable doubt that Sweet entered a dwelling. The State may or may not have charged Sweet with the severity level 4 person felony, but the jury definitely convicted Sweet of the level 4 person felony.

A mismatch between the charging document and the conviction is cause for concern. In *State v. Haberlein*, 296 Kan. 195, 290 P.3d 640 (2012), the State charged Robert Martin Haberlein with aggravated robbery, among other crimes. Count III of the information charged Haberlein with aggravated robbery, alleging that he "'did unlawfully, feloniously and willfully take property, to-wit:  money, *from the presence* of another, to-wit:  Robin Bell, by force.'" 296 Kan. at 209. But the jury was instructed to determine whether Haberlein "'intentionally took property, to-wit:  money, *from the person or presence* of Robin Bell.'" 296 Kan. at 210. On appeal, Haberlein argued that the instruction should not have included "'the person'" because the information only alleged "the presence," not "the person or presence." 296 Kan. at 209-10.

Our Supreme Court held that the instruction was not clear error. 296 Kan. at 211. The State is bound by the language in the charging document and at trial may only present the version of the offense or theory of the case set forth in the charging document. *State v. Trautloff*, 289 Kan. 793, 802-03, 217 P.3d 15 (2009). The State must inform the defendant of the nature of the accusation against him, and the district court must exercise caution in conforming the jury instructions to the charges. *State v. Jones*, 290 Kan. 373,

384, 228 P.3d 394 (2010). The *Haberlein* court held that instructions should not be broader than the charges contained in the information. 296 Kan. at 210. But the questioned jury instruction was not broader. "A taking from Bell's person necessarily also constituted a taking from her presence. Thus the addition of that word in the instruction added nothing not already covered in the information." 296 Kan. at 211. The jury convicted Haberlein of taking "from the person or presence" of Bell even though this language did not match the information. 296 Kan. at 210. This variance between the crime charged and the crime as convicted did not constitute clear error.

But a variance between the language of the complaint and the crime as convicted can deprive the defendant of due process. *State v. Mosby*, No. 115,598, 2017 WL 2610765, at *3 (Kan. App. 2017) (unpublished opinion). The State charged Christopher Kyle Mosby with burglary of a dwelling, theft, and criminal damage to property. The complaint alleged that Mosby stole property worth more than $1,000 but less than $25,000, including but not limited to 20 specified items. At the preliminary hearing, evidence showed total property loss slightly over $3,000. After a jury convicted Mosby of burglary of a dwelling and theft, the victims testified at a restitution hearing. They stated what they believed the items to be worth and also requested restitution for items discovered missing after the trial. Mosby objected to being held financially responsible for the alleged loss of items that the jury had not convicted him of stealing.

The *Mosby* court held that Mosby did not receive adequate notice of the charges against him because the charging document did not list all the items he allegedly stole, resulting in his inability to prepare an adequate defense at trial and at the restitution hearing. 2017 WL 2610765, at *2, 4. Notably, between the preliminary hearing and the trial, the value of property Mosby allegedly stole jumped from roughly $3,000 to upwards of $15,000 without the State amending the complaint. The *Mosby* court held that the State violated Mosby's right to present a defense, reversed Mosby's theft conviction, and remanded for further proceedings. 2017 WL 2610765, at *4, 11.

Appellants address a mismatch between the crime as charged and the crime as convicted under different rubrics. In *Haberlein*, the issue was framed as a jury instruction error while the *Mosby* court addressed the issue as a lack of notice to the defendant. In *State v. Toland*, No. 114,658, 2017 WL 658537 (Kan. App. 2017) (unpublished opinion), Nicholas Toland argued that the error was a jury instruction issue. The State charged Toland with several crimes including burglary and conspiracy to commit burglary. The State's first amended information included the names of the coconspirators in Count II, which set forth the charge of conspiracy. Toland argued that the jury instructions were impermissibly broader than the first amended information. See *State v. McClelland*, 301 Kan. 815, 828, 347 P.3d 211 (2015) ("[T]he State is bound by the wording of its charging document, and the prosecution and district court must use caution in conforming the jury instructions to the charges."). The *Toland* court affirmed the conviction, holding that the names of the coconspirators were not elements of the crime. Thus, the inclusion of names in the information and the exclusion in the jury instructions was not legal error. 2017 WL 658537, at *8-9.

But a variance between the crime as charged and the crime as convicted is most accurately described as a constructive amendment. This court raised the issue of constructive amendment sua sponte in *State v. Holmes*, No. 116,338, 2017 WL 5617102 (Kan. App. 2017) (unpublished opinion). The *Holmes* court became aware of an issue not briefed by the parties and dispositive of the appeal, ordering the parties to brief the issue of whether the trial court's instructions allowed the jury to convict Holmes of an offense which the State had not charged. The *Holmes* court reversed Holmes' conviction because the State charged Holmes with one crime, but the jury convicted him of another. 2017 WL 5617102, at *6.

The State charged Holmes with aggravated battery under K.S.A. 2015 Supp. 21-5413(b)(1)(B). The operative language in that subsection was "'knowingly *causing bodily harm* to another person . . . in any manner whereby great bodily harm, disfigurement or

death can be inflicted.'" (Emphasis added.) 2017 WL 5617102, at *1. But the trial court's instruction to the jury mirrored the language of K.S.A. 2015 Supp. 21-5413(b)(1)(C), which stated that aggravated battery was "'knowingly *causing physical contact* with another person when done *in a rude, insulting or angry manner* . . . or in any manner whereby great bodily harm, disfigurement or death can be inflicted.'" (Emphasis added.) 2017 WL 5617102, at *2. And during closing arguments, the State contended that "'[w]hat we do have is that there was *physical contact in a rude, insulting, or angry manner* whereby great bodily harm, disfigurement, or death can be inflicted,'" which followed K.S.A. 2015 Supp. 21-5413(b)(1)(C). (Emphasis added.) 2017 WL 5617102, at *2.

The *Holmes* court noted a significant difference between causing bodily harm versus causing rude, insulting, or angry physical contact. The *Holmes* court concluded that Holmes was convicted of a crime that the State never charged.

> "We know that Holmes was convicted under K.S.A. 2015 Supp. 21-5413(b)(1)(C) because the jury instruction given at trial reflects the language from that section of the statute. Thus, when the jury deliberated, it considered the elements from K.S.A. 2015 Supp. 21-5413(b)(1)(C) and not the elements from K.S.A. 2015 Supp. 21-5413(b)(1)(B)." 2017 WL 5617102, at *3.

The *Holmes* court then analyzed the errors under a constructive amendment framework before granting Holmes a new trial.

The United States Supreme Court has held that "a court cannot permit a defendant to be tried on charges that are not made in the indictment against him." *Stirone v. United States*, 361 U.S. 212, 217, 80 S. Ct. 270, 4 L. Ed. 2d 252 (1960). The *Stirone* Court noted that as far back as 1887, "it has been the rule that after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself." 361 U.S. at 215-16. "An indictment is constructively amended if the evidence presented at

39

trial, together with the jury instructions, raises the possibility that the defendant was convicted of an offense other than that charged in the indictment. [Citations omitted.]" *United States v. Apodaca*, 843 F.2d 421, 428 (10th Cir. 1988). "[T]he language employed by the government in its indictments becomes an essential and delimiting part of the charge itself." *United States v. Farr*, 536 F.3d 1174, 1181 (10th Cir. 2008). This court has applied the rule against constructive amendments as enforcing the State's responsibility to amend the charging instruments, rather than allow the trial court on its own to amend the crime as presented to the jury. Allowing the trial court to amend the State's charges by submitting jury instructions which did not match the language of the complaint "would render meaningless the procedural requirements established for amendment of charging instruments." *In re Habeas Corpus Petition of Weimer*, No. 106,862, 2012 WL 6061619, at *5 (Kan. App. 2012) (unpublished opinion) (explaining that K.S.A. 22-3201[e] requires the State to amend its complaint with the trial court's permission, but it does not allow the court to amend the crime by submitting jury instructions which do not match the complaint).

The crux of constructive amendment analysis is whether the elements submitted to the jury are broader than the crime as charged by the State. In *Haberlein*, the jury instruction did not impermissibly broaden the basis for conviction against Haberlein. 296 Kan. at 211. The complaint charged aggravated robbery by describing a taking "from the presence" while the jury instructions described taking "from the person or presence." 296 Kan. at 209-10. But since taking from someone's person is necessarily included in taking from someone's presence, the *Haberlein* court affirmed because the basis for Haberlein's conviction was not broader than the complaint. 296 Kan. at 211. "Personal property can be taken from a victim's 'presence' without being taken from his or her 'person,' but it cannot be taken from his or her 'person' without being taken in his or her 'presence.'" *State v. Robinson*, 27 Kan. App. 2d 724, 728-29, 8 P.3d 51 (2000) (reversing Robinson's conviction because the State charged aggravated robbery from the victim's "'person,'" but not "'presence,'" and no reasonable juror could conclude that Robinson took the car from

the victim's "'person'"). And in *Toland*, the jury instructions did not include the names of coconspirators which were in the complaint. Because the names of coconspirators are not an element of conspiracy, the change of language did not broaden the basis of Toland's conviction. 2017 WL 658537, at *8.

But in *Mosby*, the State charged Mosby with theft, listing items stolen in the complaint. Then at trial, the State presented evidence of 23 additional items which were not charged in the complaint, and at the restitution hearing the State added a further 96 items not charged in the complaint. The *Mosby* court held that the State impermissibly broadened Mosby's criminal liability by expanding the list of items he allegedly stole, undermining his ability to present a defense. 2017 WL 2610765, at *4. And the jury in *Holmes* found Holmes guilty of causing rude, insulting, or angry physical contact, which is broader than causing bodily harm, necessitating a new trial. 2017 WL 5617102, at *2, 6. Similarly, in *Trautloff*, 289 Kan. at 802-03, the State alleged that Melvin Trautloff committed sexual exploitation of a child when he "displayed" a picture of sexually explicit conduct by a child under 14 years of age. But an impermissibly broad instruction allowed the jury to convict Trautloff of displaying or procuring or producing a photograph including sexually explicit conduct by a child under 14 years of age. The *Trautloff* court reversed and remanded for a new trial. 289 Kan. at 803-04.

But Sweet does not present an argument that the complaint did not match the trial evidence and jury instructions. See *State v. Dickerson*, No. 125,529, 2024 WL 62834, at *1 (Kan. App. 2024) (unpublished opinion) ("Sometimes, criminal charges are misaligned with the evidence presented at trial. This misalignment can be aggravated by the giving of jury instructions and arguments of counsel. When the misalignment becomes too great, the conviction must be reversed as a violation of due process."). In his brief and at oral argument, Sweet repeatedly contended that the State's complaint properly charged the crime of conviction, meaning aggravated burglary under K.S.A. 2021 Supp. 21-5807(b)(2) according to Sweet. Sweet did not argue that the evidence at

41

trial varied from the charged conduct, warranting reversal. See *Dickerson*, 2024 WL 62834, at *2 ("Differences in the charged conduct and the evidence proven at trial present variances which may warrant reversal."). But Sweet insists that he was properly charged with and convicted of the severity level 5 person felony of aggravated burglary of a structure other than a dwelling under K.S.A. 2021 Supp. 21-5807(b)(2). He maintains that an error occurred at sentencing when he was sentenced for a severity level 4 person felony under K.S.A. 2021 Supp. 21-5807(b)(1).

To arrive at this conclusion, Sweet must ignore the language of the jury verdict, which found him guilty of "Aggravated Burglary of a Dwelling" after the jury was instructed to find whether he "entered a dwelling." He looks past the jury instructions and verdict to the State's complaint, sees the word "structure" in the complaint rather than "dwelling," and concludes that this must mean he was convicted of aggravated burglary of an "other structure which is not a dwelling" under K.S.A. 2021 Supp. 21-5807(b)(2). Thus, he presents his argument not as a constructive amendment, but as a sentencing error.

Here, the State charged Sweet in its first amended complaint with aggravated burglary under K.S.A. 2021 Supp. 21-5807(b) by using the clause "without authority [to] enter into, or remain within, any structure or motor vehicle, to-wit: . . . Leavenworth KS, belonging to Tyler Smith, with the intent to commit a felony therein, and at the time there was one or more human beings present therein." This language is awkward as to which subsection under (b) would apply. Subsection (b)(1) applies to structures which are dwellings. Subsection (b)(2) applies to any "other structure which is not a dwelling." And subsection (b)(3) applies to vehicles. While the better practice may have been for the State to use the word dwelling and the language as drafted might be sloppy, the State did point out that there were human beings present in the structure, it did cite K.S.A. 2021 Supp. 21-5807(b)(1), and it did clarify that it was charging an aggravated burglary, a severity level 4 person felony. At trial, through the State's evidence and argument and

42

through the jury instructions, the basis for Sweet's conviction did not become broader. If anything, it narrowed from "any structure or motor vehicle" to only those structures which are dwellings. Thus, any variance between the crime as charged and the crime of conviction was not a constructive amendment requiring reversal. Also, in any event, this is not the argument that Sweet presents to this court.

Instead, Sweet contends that an error occurred between his conviction and his sentencing. Thus, he maintains in his reply brief that the amended complaint is not *defective*. For example, Sweet argues "that the amended complaint charged a crime different than the one for which he was sentenced." He contends that he was convicted under K.S.A. 2021 Supp. 21-5807(b)(2), but then sentenced as if he had been convicted under K.S.A. 2021 Supp. 21-5807(b)(1). Nevertheless, Sweet was convicted under K.S.A. 2021 Supp. 21-5807(b)(1) because the jury instruction given at trial reflects the language from that section of the statute. Here, Sweet was convicted of aggravated burglary of a dwelling because the jury received instructions which matched the language of K.S.A. 2021 Supp. 21-5807(b)(1), not (b)(2). Thus, no error occurred between Sweet's conviction and his sentencing.

VIII. *Did cumulative error deprive Sweet of a fair trial?*

Sweet argues that cumulative errors deprived him of a fair trial. The State asserts that the trial errors that Sweet complains of do not combine and do not warrant reversal. Because any errors were harmless individually and in aggregate, this court should affirm Sweet's conviction.

Cumulative trial errors, when considered together, may require reversal of the defendant's conviction when the totality of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. *State v. Hirsh*, 310 Kan. 321, 345, 446 P.3d 472 (2019). In assessing the cumulative effect of errors during the

43

trial, appellate courts examine the errors in the context of the entire record, considering how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence. 310 Kan. at 345-46.

If any of the errors being aggregated are constitutional in nature, their cumulative effect must be harmless beyond a reasonable doubt. *State v. Thomas*, 311 Kan. 905, 914, 468 P.3d 323 (2020). The party benefitting from the errors must establish beyond a reasonable doubt that the cumulative effect of the errors did not affect the outcome. 311 Kan. at 914.

The issues Sweet raises on appeal create an unsettling combination. On his aggravated burglary conviction, his challenge to the sufficiency of the evidence must fail because this court cannot reweigh evidence. But the issue combines with his complaint of prosecutorial error wherein the prosecutor drew the inference for the jury that Sweet put on gloves and a mask because he intended to commit aggravated assault. This prosecutorial error differs from jury instruction error. On lesser included offense instructions, our Supreme Court has found error to be harmless in cases where the evidence against the defendant was "overwhelming." See, e.g., *Rhoiney*, 314 Kan. at 504. But the use of the term overwhelming in some cases implies that other cases have evidence which is less overwhelming. And even in cases of overwhelming evidence, prosecutorial error is treated differently from instruction error.

In *King*, our Supreme Court rejected the State's argument about the strength of the evidence as follows:

"The State claims any prosecutorial error is harmless beyond a reasonable doubt primarily because the evidence in this case was overwhelming. While it is true that the

evidence overwhelmingly indicates King was one of the robbers, we expressly warned against such reasoning in *Sherman*:

> "'The focus of the inquiry is on the impact of the error on the verdict. While the strength of the evidence against the defendant may secondarily impact this analysis one way or the other, it must not become the primary focus of the inquiry. As has often been repeated, prejudice can exist even "in a strong case." [Citation omitted.]' 305 Kan. at 111." 308 Kan. at 35.

Here, the evidence of Sweet's intent to commit aggravated assault was not overwhelming, the State's first amended complaint was ambiguous, and the prosecutor's closing argument drew an inference for the jury. These three factors combined require reflection about whether their cumulative effect unfairly guided the jury to the conclusion that Sweet committed aggravated burglary because he entered the apartment intending to commit aggravated assault. Also, the jury was not instructed on both aggravated child endangerment and its lesser included offense when "[t]he location of the line between the two crimes is ultimately a jury question." *Fabre*, 2009 WL 1911696, at *7. Some cases are closer than others. Some conclusions can be arrived at with more confidence than others. But the State does not have the burden to remove all doubt. Because the State shows beyond a reasonable doubt that trial errors did not accumulate to deprive Sweet of a fair trial, we affirm his convictions and sentence.

For the preceding reasons, we affirm.

Affirmed.