IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 123,723

STATE OF KANSAS,
*Appellee*,

v.

MELISSA C. LOWE,
*Appellant.*

SYLLABUS BY THE COURT

1.

To determine whether a lesser included offense instruction is factually appropriate, a court must consider whether there is some evidence, viewed in a light most favorable to the defendant, emanating from whatever source and proffered by whichever party, that would reasonably justify the defendant's conviction for that lesser included crime.

2.

A district court commits instructional error by failing to sua sponte give a lesser included offense instruction that is both legally and factually appropriate. On appeal, to obtain reversal of a conviction based on that error, a defendant who has failed to request the instruction bears the burden to firmly convince the reviewing court the jury would have reached a different verdict had that instructional error not occurred.

Review of the judgment of the Court of Appeals in an unpublished opinion filed November 23, 2022. Appeal from Sedgwick District Court; STEPHEN J. TERNES, judge. Oral argument held September 15, 2023. Opinion filed December 1, 2023. Judgment of the Court of Appeals affirming the district court is affirmed on the issue subject to review. Judgment of the district court is affirmed.

1

*Carol Longenecker Schmidt*, of Adrian and Pankratz, P.A., of Newton, argued the cause and was on the briefs for appellant.

*Lance J. Gillett*, assistant district attorney, argued the cause, and *Noelle Relph*, legal intern, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: Melissa Lowe seeks review of a Court of Appeals decision affirming her felony conviction for aggravated assault with a deadly weapon after an incident involving her ex-husband's girlfriend. See *State v. Lowe*, No. 123,723, 2022 WL 17172123, at *3-4 (Kan. App. 2022) (unpublished opinion). Lowe argues the district court should have instructed a jury on simple assault, a misdemeanor, as a lesser included offense. We agree with her on that, but this ultimately does not end the matter in her favor because we also hold this failure did not amount to clear error—the required standard. See K.S.A. 2022 Supp. 22-3414(3) ("No party may assign as error the giving or failure to give an instruction, including a lesser included crime instruction, . . . unless the instruction or the failure to give an instruction is clearly erroneous."). Thus, we must affirm her conviction despite our disagreement with the panel's analysis. See *State v. McCroy*, 313 Kan. 531, 539, 486 P.3d 618 (2021) (affirming Court of Appeals' decision as right for the wrong reason).

FACTUAL AND PROCEDURAL BACKGROUND

Lowe and her ex-husband were in a custody dispute involving their two teenage daughters that created animosity between Lowe, her ex-husband, and his girlfriend, Mary Logsden. Lowe and her ex-husband shared custody of their daughter A.L., while their other daughter, E.L., lived with Lowe.

2

On June 30, 2019, Lowe dropped A.L. off at Plagens Park in Haysville for her softball game. Lowe and E.L. went shopping. Logsden and her daughter K.M. watched A.L. play. After the game, Logsden, A.L., and K.M. walked to the parking lot where Lowe waited with E.L. to pick up A.L. At trial, Logsden claimed Lowe "completely stared me down." Lowe told investigators Logsden called her "a fucking bitch."

After A.L. got into Lowe's car, Logsden and her daughter walked away as Logsden pulled a wagon loaded with softball gear through the gravel parking lot. Logsden said she heard tires spinning and saw Lowe's vehicle approaching. According to Logsden and K.M., it came "[v]ery close" in a way that "if [Logsden] had a belt on that day, it would have scraped [the] car." Logsden called the police.

The State charged Lowe with aggravated assault with a deadly weapon, for her use of the car. At trial various eyewitnesses testified, and Lowe's statements to investigators were introduced as evidence through a detective who interviewed her.

Logsden testified the "car was coming at" her, estimating the vehicle was travelling 5-10 miles per hour and going faster than cars typically drive through the lot. She acknowledged animosity due to the custody case but denied provoking Lowe. She rejected defense counsel's assertion she struck or punched the car.

K.M. offered similar testimony: "So we were just walking. I was right behind my mom. . . . I hear tires spin and a car came by my mom really close to my mom." K.M. said the car "just like swerved over . . . and then took off, and I just heard tires spinning both times." Her mom touched the automobile, "like trying to push herself away from it because it was that close. She didn't want to get hit."

3

An eyewitness, Brandon Burleson, testified he was behind Logsden and K.M. as Lowe left the parking lot. He testified the car "tried to hit the group of people that was walking." He told the jury: "[T]he car swerved. Then it got back over and went out of the parking lot; so I mean, there was plenty of room for that not to have happened." He agreed "[i]t was a visible deviation" from her path to drive toward Logsden and said that the vehicle was going "a little bit faster than a parking lot should have been." He thought he saw Lowe laughing as she drove by.

A.L. testified she was "pretty sure like there was something going on . . . . I just remember my mom saying something and then her swerving." She added, "[Lowe] just kind of swerved toward[] [Logsden]. It was kind of close, but then after that [I] just heard [Logsden] hit the car." During cross-examination, A.L. acknowledged Logsden said something to Lowe, but was unsure what was said. She also agreed she was on her phone answering snapchats when the incident occurred.

E.L. testified that when A.L. came out with Logsden and K.M., "[m]y mom . . . lifted up the front seat of the driver's side to let my sister in the back. . . . [Logsden] said some choice words to my mother"—"something about a fat F'ing cow." She said her mother did not seem upset by the comment; "She laughed about it." But she also said her mom texted her dad later in the day that "it was not okay to call her that in front of her children." E.L. testified Logsden flipped off her mother. She acknowledged the car's tires spun in the gravel, but explained, "it's just my mom's car is fast." She said she could see the car's speedometer from where she was sitting and said "[i]t wouldn't have gone over like 15." She also said she did not think the car was close to hitting Logsden, and she disagreed with the characterization that if Logsden were wearing a belt, it would have scratched the car. She said she saw nothing out of the ordinary, like someone chasing after the car or yelling for them to stop, after passing by Logsden.

4

Detective Justin Hehnke, who interviewed Lowe, testified she admitted her car's tires spun in the gravel but claimed this happened because it was a new car she was still getting used to. She denied driving toward Logsden, saying she drove straight out of the parking lot. She also claimed Logsden "had stepped out about two or three feet in the direction of her car and hit her car with her hand." Lowe acknowledged Logsden's language upset her, and "she ended up eventually sending a text message to her ex-husband stating that she didn't appreciate [Logsden] making comments in front of the girls like that." She also admitted she flipped off Logsden while she was leaving the parking lot.

During a jury instruction conference, Lowe's counsel did not object to the State's proposed instruction on aggravated assault or request simple assault as a lesser included offense of the charged crime. The aggravated assault instruction given to the jury read:

"To establish this charge, each of the following claims must be proved:

"1. The defendant knowingly placed [Logsden] in reasonable apprehension of immediate bodily harm.

"2. The defendant did so with a deadly weapon.

"3. This act occurred on or about the 30th day of June, 2019 in Sedgwick County, Kansas.

"No bodily contact is necessary.

"A deadly weapon is an instrument which, from the manner in which it is used, is calculated or likely to produce death or serious bodily injury. An object can be a deadly weapon if the user intended to convince a person that it is a deadly weapon and that person reasonably believed it to be a deadly weapon."

5

During closing arguments, Lowe's attorney did not dispute whether the car qualified as a deadly weapon. Instead, the defense centered on whose version of the incident was true—more specifically, whether Lowe had swerved at Logsden. The jury found Lowe guilty of aggravated assault. The district court sentenced her to an underlying sentence of 12 months but granted her 24 months' probation.

Lowe appealed, arguing insufficient evidence supported her conviction, and that the district court clearly erred by omitting an unrequested jury instruction on a lesser included crime of simple assault. The panel rejected both challenges. *Lowe*, 2022 WL 17172123, at *1.

She petitioned this court to review the instructional issue, which we granted. She did not seek review on her evidence sufficiency argument, so that much is settled. See Supreme Court Rule 8.03(i)(1) (2023 Kan. S. Ct. R. at 59). Jurisdiction is proper. See K.S.A. 20-3018(b) (providing for petitions for review of Court of Appeals decision); K.S.A. 60-2101(b) (Supreme Court has jurisdiction to review Court of Appeals decisions upon petition for review).

ANALYSIS

On the lesser included crime instructional issue, the panel sided with the State's argument that the omitted instruction was factually inappropriate. The panel noted the only evidence at trial showed an encounter between Lowe and Logsden while Lowe was in her car. It observed Lowe's defense "was not that she did not use a car, but that she did not commit an assault *at all*." *Lowe*, 2022 WL 17172123, at *4. It interpreted her defense to mean she did not commit a crime because she simply drove away, even if angrily, after Logsden allegedly insulted her. The panel concluded, based on the evidence, that Lowe

6

either committed aggravated assault with a deadly weapon "or no crime at all." 2022 WL 17172123, at *4.

The State did not cross-petition for review of the panel's holding that a simple assault instruction was legally appropriate, so we consider first the panel's analysis of the unrequested instruction's factual appropriateness. See *State v. Berkstresser*, 316 Kan. 597, 601, 520 P.3d 718 (2022) ("The State chose not to dispute that an instruction for the misdemeanor crime would have been legally appropriate, so our focus is drawn to factual appropriateness."); Supreme Court Rule 8.03(b)(6)(C)(i) (2023 Kan. S. Ct. R. at 56) ("The Supreme Court will not consider . . . issues not presented or fairly included in the petition for review."); cf. *State v. Nelson*, 224 Kan. 95, 97, 577 P.2d 1178 (1978) ("A simple assault is a lesser included offense of aggravated assault with a deadly weapon.").

*Standard of review*

"A legally appropriate lesser included offense instruction must be given when there is some evidence, viewed in a light most favorable to the defendant, emanating from whatever source and proffered by whichever party, that would reasonably justify the defendant's conviction for that lesser included crime." *Berkstresser*, 316 Kan. at 601. Our review for factual appropriateness is de novo. *State v. Love*, 305 Kan. 716, 736, 387 P.3d 820 (2017).

*The omitted instruction was factually appropriate.*

Under K.S.A. 2022 Supp. 22-3414(3), a lesser included offense instruction is factually appropriate so long as "some evidence . . . would reasonably justify a conviction of some lesser included crime." It is a trial court's duty to evaluate the evidence and provide an instruction when appropriate. "This duty to instruct applies even if the

7

evidence is weak or inconclusive." *State v. Roberts*, 314 Kan. 835, 852, 503 P.3d 227 (2022). "Providing lesser included offense instructions allows a jury to consider the full range of possible verdicts supported by the evidence." 314 Kan. at 852.

The State charged Lowe with aggravated assault under K.S.A. 2018 Supp. 21-5412(b)(1). That subsection defines this crime as "assault, as defined in subsection (a), committed . . . [w]ith a deadly weapon." Subsection (a) defines assault as "knowingly placing another person in reasonable apprehension of immediate bodily harm." K.S.A. 2018 Supp. 21-5412(a).

*Berkstresser* presents an analogous question. It dealt with whether a misdemeanor fleeing or attempting to elude a police officer was a factually appropriate lesser included offense to the charged offense of felony fleeing or attempting to elude. *Berkstresser*, 316 Kan. at 603. The *Berkstresser* court recited the five elements of the felony crime and noted "the first four elements standing alone constitute misdemeanor fleeing." 316 Kan. at 604. The fifth charged element was "'[t]he defendant engaged in reckless driving.'" 316 Kan. at 604. It then noted the *Berkstresser* panel below "looked to whether some evidence showed Berkstresser 'did *not* drive [recklessly].'" 316 Kan. at 604. But this court on review rejected that approach because doing so would extend the analysis "beyond deciding whether the evidence presented could satisfy the misdemeanor offense's statutory elements." 316 Kan. at 604. Ultimately, "the record contain[ed] ample support to reasonably justify a misdemeanor conviction" of the lesser crime. 316 Kan. at 604. The same is true here.

In Lowe's case, the only difference between aggravated assault and simple assault is the deadly weapon element, which is not statutorily defined. But our caselaw has filled that gap. In *State v. Hanks*, 236 Kan. 524, 694 P.2d 407 (1985), *superseded by statute on other grounds as stated in State v. Robinson*, 303 Kan. 11, 363 P.3d 875 (2015), the court

8

interpreted the term by relying on the dictionary definition. 236 Kan. at 537 (citing Black's Law Dictionary 487 [4th ed. 1968]). The *Hanks* court held: "A deadly weapon is an instrument which, from the manner in which it is used, is calculated or likely to produce death or serious bodily injury." 236 Kan. at 537 (aggravated battery case; noting "[b]attery committed with a deadly weapon is aggravated battery"). This is a factual question, meaning the determination of whether Lowe's car constituted a deadly weapon under the circumstances was a jury question. See *State v. Whittington*, 260 Kan. 873, 878, 926 P.2d 237 (1996).

Admittedly, the test for determining whether something is a deadly weapon may present an objective or subjective component, depending on the crime. Compare 260 Kan. at 878 (aggravated battery; employing an objective test: "'an instrument which, from the manner in which it is used, is calculated or likely to produce death or serious bodily injury'"), with *State v. Deutscher*, 225 Kan. 265, 270-71, 589 P.2d 620 (1979) (aggravated assault; holding "an unloaded revolver which is pointed in such a manner as to communicate to the person threatened an apparent ability to fire a shot and thus do bodily harm is a deadly weapon within the meaning expressed by the legislature in the assault statutes"); *State v. Graham*, 27 Kan. App. 2d 603, 606-07, 6 P.3d 928 (2000) (aggravated assault; noting a test is subjective under *Deutscher*). But that distinction would be immaterial here because Lowe does not contest the aggravated assault jury instruction.

We hold there was sufficient evidence to support Lowe's conviction for aggravated assault, which necessarily means an instruction on simple assault was factually appropriate—regardless of her defense theory. The jury should have been given the option of choosing between simple and aggravated assault, even if she did not request the lesser instruction. See *Roberts*, 314 Kan. at 852 (holding a trial court has a duty to provide a legally and factually appropriate instruction); *State v. Williams*, 303 Kan. 585,

599, 363 P.3d 1101 (2016) (holding that a lesser included offense instruction is not foreclosed even if it is inconsistent with either the evidence presented by the defense or the theory advanced by the defense).

The district court erred by omitting a simple assault instruction and the panel erred when holding: "There was no evidence presented to show that Lowe committed a simple assault, meaning an assault without the vehicle." *Lowe*, 2022 WL 17172123, at *4. The *Lowe* panel repeated the same mistake as the *Berkstresser* panel. *Berkstresser*, 316 Kan. at 604 (concluding the panel erred by holding a misdemeanor instruction was factually inappropriate because no evidence showed the defendant "'did *not* drive [recklessly],'" which was the element "that elevates the offense to a felony").

*This error is not reversible.*

The next question is whether the failure to give the unrequested instruction was reversible error under K.S.A. 2022 Supp. 22-3414(3). Lowe concedes she did not request a simple assault instruction or otherwise object to the district court's instructions. The clear error standard requires a reviewing court to decide whether it is firmly convinced the jury would have reached a different verdict had the error not occurred. We make that determination de novo based on the entire record, and Lowe bears the burden to establish reversibility. See *State v. Bentley*, 317 Kan. 222, 242, 526 P.3d 1060 (2023).

Here, the jury rejected Lowe's version of events that denied swerving her car toward or close to Logsden. And depending on how it interpreted her intention, it was a question for the jury to determine whether her actions turned the car into a deadly weapon. But nothing in the record establishes the jury would have reached a different result, especially given the conflicting versions requiring multiple credibility determinations. In the end, the jury found the witnesses' accounts that Lowe swerved her

10

car towards Logsden credible enough to find her guilty beyond a reasonable doubt, including testimony from a non-family eyewitness who agreed Lowe's car "tried to hit the group of people that was walking" by swerving her car towards them by making "a visible deviation" from her path before getting back over and leaving the parking lot and emphasizing "there was plenty of room for that not to have happened."

Based on the evidence in this record, we are not firmly convinced the jury would have reached a different verdict had the district court given a simple assault instruction.

Judgment of the Court of Appeals affirming the district court is affirmed on the issue subject to review. Judgment of the district court is affirmed.

\* \* \*

STEGALL, J., dissenting: The facts of this case resemble a classic "roll up"— often portrayed in popular culture as a slow vehicle roll next to a group of people intended, variously, to bully, intimidate, or impress. See Urban Dictionary, https://www.urbandictionary.com/define.php?term=rolled+up+on (defining "rolled up on" as pulling up next to someone in a vehicle "in order to intimidate"); see also *United States v. Bowra*, No. CR 16-161, 2018 WL 1244521, at \*7 (W.D. Pa. 2018) (unpublished opinion) (law enforcement testimony about the common practice, when surveillance is not possible, of using a "'marked police car'" to "'roll up on'" suspects to "'ID them and see what's going on'"); *Dazed and Confused* (Universal Pictures 1993) ("Alright, alright, alright.").

Bad blood gave rise to flaring tempers between an ex-wife (the defendant) and her ex-husband's current girlfriend. Those tempers turned into an argument and name-calling in the parking lot following a girls' softball game. As she left, the defendant "rolled up"

11

on the girlfriend—steering her car close enough that multiple people testified the victim slapped or hit the car in retort. The defendant then sped away amidst a flurry of shouts and raised fingers. Not anyone's finest moment, certainly. Unacceptable behavior in a civilized society, yes. But was it assault *with a deadly weapon*? That is the question.

And this is the question the jury was never given a chance to fairly consider. Here, I agree with the majority that a lesser-included instruction for simple assault should have been given. Slip op. at 2, 9. The jury was told the issue was all or nothing—either the defendant assaulted the victim with a deadly weapon or the defendant did nothing wrong. For this reason, I disagree with the majority's consideration of reversibility—that is, was the failure to give the jury a middle option clear error?

In weighing this crucial question, appellate judges are tasked to decide whether we are firmly convinced that had the lesser included instruction been given, the result would have been different. Slip op. at 10. But nowhere in our caselaw are we given guidance on how, precisely, we are to undertake that task. Are appellate judges to place themselves in the jury box? It would seem not, as this may require an exercise in appellate fact-finding. I am left instead to simply consider the law's explicit description of the jury function more generally.

The American jury system entrusts jurors with a more nuanced role than mere algorithmic guilt-or-innocence determinations. Indeed, while the jury function is often short-handed as "fact-finding," this description too often elides and disguises the jury's humanizing impact on mechanical applications of the law. Juries represent the deliberative sense of one's neighbors and peers. They establish and enforce community standards and norms of behavior that cannot always be cleanly captured by legal doctrines, elements of crimes, and black letter law. "Juries provide a buffer between government and the individual. They humanize the law." Dann, *Free the Jury*, Litigation,

at 5 (Fall 1996). Juries "make available the commonsense judgment of the community" which can both set behavioral boundaries for members of the community and "guard against the exercise of arbitrary power" in the hands of more formal actors in the judicial drama. *Taylor v. Louisiana*, 419 U.S. 522, 530, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975); see also 1 Holdsworth, A History of English Law 349 (3d ed. 1922) (The jury system grounds "rules of law to the touchstone of contemporary common sense."). Most long-time observers of juries in action understand that very often, "juries feel, 'There, but for the grace of God, go I.'" Ericsson, *Raising Skeletons and Objections Deposition Defense Strategy*, Brief, at 40 (Spring 1986). And here, by failing to give the jury the option of simple assault, the trial court deprived the defendant of her right to the "benefit of the . . . judgment of the community." *Lockhart v. McCree*, 476 U.S. 162, 175, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986).

With this critical function in mind, I must consider my own long experience with Kansas juries and how they faithfully execute this duty. And so doing, I am left with the strong feeling that most Kansas jurors would—considering the totality of the record— have opted to convict the defendant of simple assault if given that option. Most Kansas jurors would see the defendant's behavior as worthy of criminal sanction but would not have "made a felony case" of it. Weighing all of this, I am firmly convinced that had an instruction for simple assault been given, the result would have been different. I would reverse the defendant's conviction and remand for a new trial.

LUCKERT, C.J., and WALL, J., join the foregoing dissent.