NOT DESIGNATED FOR PUBLICATION

No. 125,941

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DONALD DEAN COLLINS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Labette District Court; FRED W. JOHNSON JR., judge. Submitted without oral argument. Opinion filed October 4, 2024. Affirmed in part, sentence vacated in part, and case remanded for resentencing.

*Emily Brandt*, of Kansas Appellate Defender Office, for appellant.

*Mandy Johnson*, county attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before PICKERING, P.J., MALONE and WARNER, JJ.

PICKERING, J.: A jury convicted Donald Dean Collins of second-degree reckless murder and interference with law enforcement. On appeal, Collins makes five arguments: (1) His second-degree reckless murder conviction was supported by insufficient evidence; (2) the district court should have instructed the jury on involuntary manslaughter; (3) the State committed prosecutorial error by using "we know" statements during closing argument; (4) cumulative error deprived him of his right to a fair trial; and (5) the district court erred when sentencing him for his nonbase crime. After reviewing the record, we affirm Collins' convictions but vacate the sentence for his interference with

1

law enforcement conviction and remand for the district court to resentence him on that conviction.

## COLLINS IS CONVICTED AND SENTENCED

Following a car accident in the early morning of February 15, 2020, police dropped off Collins and his girlfriend, Nina Lee, at the Canterbury Inn in Parsons. At 12:42 p.m. that day, Collins left the hotel room, walked around the hotel, paid for his hotel room, and walked to Braum's nearby. Collins returned to the hotel room at 1:11 p.m.

At 1:39 p.m., a 911 call was placed requesting emergency assistance at the Canterbury Inn. The caller said the person needing assistance had overdosed on methamphetamine. A short time later, Parsons Police Officer Russell Parsons arrived at Collins' hotel room after being dispatched to assist emergency medical services (EMS). Parsons saw Lee lying on the floor in the bathroom doorway while Collins was kneeled over Lee "hysterical, kind of screaming." Collins told Parsons that he had walked to Braum's, came back to the hotel, and found Lee on the floor. He said Lee had been on the floor for about 10 minutes.

Officer Waylon Kepley arrived at the scene shortly after Parsons and checked for Lee's pulse. Finding no pulse, Kepley pulled Lee away from the bathroom to perform CPR. Collins told Kepley that he and Lee had gotten in an argument, he went to get food, came back, and found Lee in the tub. Collins also told Kepley that Lee had been on the floor for about 10 minutes.

EMS paramedic Travis Modesitt observed that Lee's body was cold to the touch on her core and her arms. He also found that the water in the bathtub was cold. Shortly after 2 p.m., Lee was pronounced dead at the scene.

During Lee's autopsy, Dr. Altaf Hossain, the forensic pathologist, found a sock and a straw lodged in Lee's throat, blocking her airway. He testified that the sock was "sitting in such a way, there [was] no chance of the airway to flow from the nose or mouth into the lung." Dr. Hossain said that "substantial pressure from the top" was required to push the sock as deep as he found it in Lee's airway. He also found a "very high amount" of methamphetamine in Lee's blood. Dr. Hossain believed that, given Lee's intoxication and how deep into her airway the sock and straw sat, Lee could not have put the sock and straw there herself. He determined that the cause of death was "asphyxiation due to a foreign body in the airway" with "[m]ethamphetamine intoxication" as a contributory cause. He did not find any signs of struggle. Dr. Hossain also found contusions on Lee's lip, oral cavity, and upper chest. He could not determine when those injuries occurred.

Detective Robert Queen later arrived at the scene and investigated the bathroom. He found cloudy water in the tub and a Braum's cup sitting on the tub. After he was notified of Dr. Hossain's findings, Queen watched the Canterbury Inn's surveillance footage from February 15, 2020. The hotel's security cameras operated on motion sensors. On the footage, Queen saw a sheriff's deputy drop off Collins and Lee at the hotel at 5:51 a.m. The next movement Queen saw was when a maid went to Collins' room at 10:24 a.m. to deliver towels. The maid told Queen that Collins appeared happy and normal when she brought the towels. Queen said the next movement was when Collins left the room at 12:42 p.m., paid for the hotel room, and walked to Braum's. Collins was seen buying food at Braum's at 1:02 p.m. Collins returned to the hotel room at 1:11 p.m. Queen watched the surveillance footage between 12:42 p.m. and 1:11 p.m. and saw no one else go in or out of the hotel room. Queen saw no other movement after Collins returned to the room until police arrived at 1:44 p.m.

Queen testified that when Collins paid for the hotel room, he was wearing a Realtree shirt. After looking through the items left in Collins' hotel room, Queen found a

3

similar Realtree shirt and a sock matching the one found in Lee's airway. In the Realtree shirt's pocket, Queen found an empty Braum's straw wrapper and a Braum's receipt.

The State charged Collins with second-degree intentional murder under K.S.A. 2019 Supp. 21-5403(a)(1) and interference with law enforcement under K.S.A. 2019 Supp. 21-5904(a)(1)(C). At the State's request, the district court included a jury instruction on the lesser included offense of second-degree reckless murder. At Collins' request, the district court also included an instruction on voluntary manslaughter. The jury convicted Collins of second-degree reckless murder and interference with law enforcement. The district court sentenced Collins to 205 months' imprisonment for the second-degree reckless murder conviction and 12 months' imprisonment for interference with law enforcement, for a controlling sentence of 217 months.

COLLINS RAISES FIVE ISSUES ON APPEAL

I.  COLLINS' SECOND-DEGREE RECKLESS MURDER CONVICTION IS SUPPORTED BY SUFFICIENT EVIDENCE

On appeal, Collins challenges the sufficiency of the evidence for his conviction. He argues that rather than presenting evidence of an unintentional but reckless killing, the State presented evidence showing an intentional killing.

*Standard of Review*

Collins raises a sufficiency of the evidence challenge that is based on interpretation of the second-degree reckless murder statute, K.S.A. 2019 Supp. 21-5403, and culpable mental states statute, K.S.A. 2019 Supp. 21-5202. Statutory interpretation is a question of law over which this court has unlimited review. *State v. Ward*, 307 Kan. 245, 251, 408 P.3d 954 (2018). Upon our interpretation of these statutes, the remaining

question is whether the State presented sufficient evidence to support Collins' second-degree reckless murder conviction. See *State v. Chavez*, 310 Kan. 421, 425-26, 447 P.3d 364 (2019); *Ward*, 307 Kan. at 251.

When a defendant challenges the sufficiency of the evidence, "an appellate court decides whether—after reviewing the evidence in the light most favorable to the State—it is convinced that a rational fact-finder could have found the defendant guilty beyond a reasonable doubt." *State v. Butler*, 317 Kan. 605, 607, 533 P.3d 1022 (2023). In this analysis, an appellate court does not reweigh evidence, resolve evidentiary conflicts, or determine witness credibility. 317 Kan. at 608.

*Proof of a Higher Level of Intent Also Proves Lower Levels of Intent*

In Kansas, second-degree reckless murder is defined as a killing committed "unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life." K.S.A. 2019 Supp. 21-5403(a)(2). "A person acts 'recklessly' or is 'reckless,' when such person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 2019 Supp. 21-5202(j). The "unintentional but reckless" mental state refers to the intent to kill. *State v. Gentry*, 310 Kan. 715, 725, 449 P.3d 429 (2019). As a result, second-degree reckless murder requires an intentional act with an unintentional but reckless killing. 310 Kan. at 725.

Under Kansas law, "[c]ulpable mental states are classified according to relative degrees, from highest to lowest, as follows: (1) Intentionally; (2) knowingly; (3) recklessly." K.S.A. 2019 Supp. 21-5202(b). Under this same statute, "[p]roof of a higher degree of culpability . . . constitutes proof of the culpability charged. If recklessness suffices to establish an element, that element also is established if a person acts

5

knowingly or intentionally." K.S.A. 2019 Supp. 21-5202(c). Accordingly, because evidence of an intentional mental state establishes proof of a reckless mental state, K.S.A. 2019 Supp. 21-5202(c) directly refutes Collins' argument.

In *Chavez*, our Supreme Court considered a similar argument. There, Chavez was convicted of stalking, among other crimes. He argued that the stalking statute was contradictory because K.S.A. 2018 Supp. 21-5427(a)(3) required a reckless act after being served with a protection from abuse (PFA) order. But K.S.A. 2018 Supp. 21-5427(c) provided that a person who committed a stalking act after being served with a PFA order was presumed to have acted knowingly. Logically, proving the same conduct was both reckless and knowing were mutually exclusive propositions. The *Chavez* court acknowledged that it is factually impossible for a person to both intend and not intend to commit the same act. 310 Kan. at 428. Yet the court explained:

"Because K.S.A. 2018 Supp. 21-5202(c) permits recklessness to be proved by establishing the defendant acted knowingly, the presumption under K.S.A. 2018 Supp. 21-5427(c)—that a person who violates a protective order after having been served with the order acts knowingly—is *not internally inconsistent* with the recklessness element of stalking under K.S.A. 2018 Supp. 21-5427(a)(3)." (Emphasis added.) *Chavez*, 310 Kan. 421, Syl. ¶ 2.

Here, Collins argues that the State presented evidence showing an intentional killing rather than presenting evidence of an unintentional but reckless killing. Collins suggests that "shoving foreign objects so deep down a woman's throat so that it is impossible for her to breathe, it is highly predictable, almost certain, that those acts will result in death." He submits that "[a] rational factfinder could not have found [Collins] guilty beyond a reasonable doubt of an unintentional but reckless killing. This was an intentional killing."

By focusing on intentionally killing his girlfriend, Collins attempts to distinguish this case from other second-degree reckless murder cases, namely *State v. Deal*, 293 Kan. 872, 269 P.3d 1282 (2012), and *State v. Cordray*, 277 Kan. 43, 82 P.3d 503 (2004). The *Deal* court found sufficient evidence of second-degree reckless murder where the defendant intentionally swung a tire iron without intent to kill. 293 Kan. at 885-86. The *Cordray* court also found sufficient evidence of second-degree reckless murder where the defendant intentionally fired a gun toward a car without intent to kill the passenger. 277 Kan. at 56.

The State responds that the evidence showed that Collins intentionally shoved the sock down Lee's throat, but he may not have intended to kill her. The State notes that the district court instructed the jury on second-degree intentional murder, second-degree reckless murder, and voluntary manslaughter, and the jury convicted on second-degree reckless murder. And, as noted by the State, the jury was in the best position to weigh the evidence, and a rational fact-finder could have found that Collins unintentionally but recklessly killed Lee. See *Butler*, 317 Kan. at 607.

Collins does not argue that the State failed to prove that he killed Lee or that the State presented evidence of a mental state lower than recklessness. Instead, he essentially argues that Lee's killing could not have simultaneously been intentional and reckless. The Kansas Supreme Court has noted that under K.S.A. 2015 Supp. 21-5202(c): "Conduct designed to cause death—and, for that matter, conduct the actor knows is reasonably certain to cause death—is now sufficient to establish the defendant acted recklessly." *State v. Louis*, 305 Kan. 453, 461-62, 384 P.3d 1 (2016).

To conclude, K.S.A. 2019 Supp. 21-5202(c) dictates that proof of an intentional killing also establishes legally sufficient proof of a reckless killing, although it may be factually impossible for Collins to have simultaneously killed Lee intentionally and recklessly. We are not persuaded by Collins' argument that proof he intentionally killed

Lee renders the evidence insufficient to establish that he unintentionally but recklessly killed Lee.

II.     THE DISTRICT COURT DID NOT ERR IN FAILING TO ISSUE A JURY INSTRUCTION ON INVOLUNTARY MANSLAUGHTER

For the first time on appeal, Collins asserts the district court erred by not providing the jury with an instruction on involuntary manslaughter. The State refutes this claim. At trial, the jury was instructed on second-degree intentional murder, second-degree reckless murder, and voluntary manslaughter. The jury convicted Collins on the reckless version of second-degree murder.

*We Review an Instructional Error Claim by Following a Three-Step Process*

In our analysis of this jury instruction issue, we must first determine whether the issue is reviewable—that is, "'whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal.'" *State v. Holley*, 313 Kan. 249, 253, 485 P.3d 614 (2021). Second, we determine whether the district court erred in failing to give the instruction. For this instructional error analysis, we must determine whether the instruction at issue was legally and factually appropriate, applying a de novo standard of review of the entire record. Third, if the district court erred, we determine whether the error requires reversal. *State v. Shields*, 315 Kan. 814, 820, 511 P.3d 931 (2022).

If a defendant fails to request a legally and factually appropriate jury instruction at trial, the omission of that instruction is reversible only if it is clearly erroneous. *State v. Butler*, 307 Kan. 831, 845, 416 P.3d 116 (2018); see K.S.A. 22-3414(3) ("No party may assign as error the giving or failure to give an instruction . . . unless the party objects thereto before the jury retires [or] unless . . . the failure to give an instruction is clearly erroneous."). The clear error principle provides "a basis for determining if an error

8

requires reversal." *State v. Lewis*, 299 Kan. 828, 856, 326 P.3d 387 (2014). An instructional error is clearly erroneous when we are firmly convinced that the jury would have reached a different verdict if the district court had given the instruction. *Shields*, 315 Kan. at 820-21. Collins did not request a jury instruction on involuntary manslaughter, so we review his claim under the clear error principle.

*The different degrees of homicide assist us in finding the instruction was legally appropriate.*

Jury instructions on lesser included crimes are legally appropriate. *State v. James*, 309 Kan. 1280, 1298, 443 P.3d 1063 (2019). Thus, we consider whether involuntary manslaughter is a lesser included crime of second-degree reckless murder.

Our state has five degrees of homicide: (1) capital murder; (2) first-degree murder; (3) second-degree murder; (4) voluntary manslaughter; and (5) involuntary manslaughter. 309 Kan. at 1298. As described previously, second-degree reckless murder is defined as a killing committed "unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life." K.S.A. 2019 Supp. 21-5403(a)(2). Involuntary manslaughter is defined as a reckless killing. K.S.A. 2019 Supp. 21-5405(a)(1).

Collins asserts that because involuntary manslaughter is part of the hierarchy of homicide crimes, involuntary manslaughter is a lesser degree of second-degree reckless murder. We agree and find that a jury instruction would have been legally appropriate. See *James*, 309 Kan. at 1298.

*We consider whether an involuntary manslaughter jury instruction would have been factually appropriate.*

"To determine whether a lesser included offense instruction is factually appropriate, a court must consider whether there is some evidence, viewed in a light most favorable to the defendant, emanating from whatever source and proffered by whichever party, that would reasonably justify the defendant's conviction for that lesser included crime." *State v. Lowe*, 317 Kan. 713, Syl. ¶ 1, 538 P.3d 1094 (2023).

Under K.S.A. 2019 Supp. 21-5405(a)(1), involuntary manslaughter is the killing of a human being which is committed recklessly. In considering whether sufficient evidence would support a finding of involuntary manslaughter, the jury would have to find that (1) Collins killed Lee; (2) the killing was done recklessly; and (3) this act occurred on or about February 15, 2020, in Labette County. See PIK Crim 4th 54.180 (2019 Supp.).

The Kansas Supreme Court has stated that because second-degree reckless murder requires proof that the defendant acted recklessly "under 'circumstances manifesting extreme indifference to the value of human life,'" second-degree reckless murder contains another element not required for involuntary manslaughter. *State v. Gonzalez*, 307 Kan. 575, 583, 412 P.3d 968 (2018). And while both crimes require recklessness, they involve different degrees of recklessness. *James*, 309 Kan. at 1300 (noting difference in degree of recklessness between reckless second-degree murder instruction and reckless involuntary manslaughter instruction).

Collins argues that if there was sufficient evidence for second-degree reckless murder, there was also sufficient evidence for an involuntary manslaughter instruction. Collins contends that because the jury convicted him of the lesser included second-degree reckless murder offense, it could have instead convicted him of involuntary manslaughter

10

if so instructed. In other words, he argues that considering the evidence in the record—when viewed in the light most favorable to Collins—the lesser instruction was warranted. We question whether the instruction was factually appropriate. But even if an involuntary manslaughter instruction was factually appropriate, as we discuss below, failing to provide that instruction was not clear error.

Under a clear error analysis, to obtain reversal of a conviction based on an instructional error, "a defendant who has failed to request the instruction bears the burden to firmly convince the reviewing court the jury would have reached a different verdict had that instructional error not occurred." *Lowe*, 317 Kan. 713, Syl. ¶ 2.

Another panel of this court examined the omission of an involuntary manslaughter instruction after a second-degree reckless murder conviction in *State v. Fleshman*, No. 118,975, 2019 WL 4725417 (Kan. App. 2019) (unpublished opinion). There, Fleshman was convicted of second-degree reckless murder on circumstantial evidence. After Fleshman's wife died from a ruptured spleen, there was conflicting expert testimony on whether the ruptured spleen could have been caused by a simple fall or whether it required physical force. The *Fleshman* panel found that because of the lack of direct evidence, the conflicting expert testimony, and the lack of external injuries, there was sufficient evidence that a "lesser included offense instruction of involuntary manslaughter was factually appropriate." 2019 WL 4725417, at *12.

The panel, however, stated that Fleshman provided "no record evidence to support his claim the jury could have found his conduct amounted only to simple recklessness" rather than an "extreme indifference to the value of human life." 2019 WL 4725417, at *13. The panel highlighted that the jury "determined the facts supported that his conduct met the heightened reckless standard." 2019 WL 4725417, at *13. Therefore, the panel found the lack of an involuntary manslaughter instruction was not clearly erroneous. 2019 WL 4725417, at *13.

11

Similar to *Fleshman*, Collins does not point to any specific evidence to show that the jury could have convicted him of simple recklessness under involuntary manslaughter instead of the heightened recklessness standard under second-degree murder. He only argues that if the jury accepted Collins' conduct as reckless, then it was possible it would have convicted him of involuntary manslaughter.

The evidence shows an intentional killing rather than recklessness. As described previously, the evidence showed substantial pressure was required to get the sock down Lee's throat such that Lee could not have done it herself. Although Collins told police he found Lee after returning from Braum's, the 911 call that brought police to the hotel was placed about 30 minutes after Collins returned from Braum's. Lee also had a straw stuck down her throat with the sock. When police arrive at Collins' hotel room, they found the empty Braum's cup sitting on the edge of the bathtub, cloudy water in the bathtub, and the insignificant amount of moisture on the bathroom floor which was inconsistent with pulling someone from a bathtub. Police later found an empty Braum's straw wrapper in Collins' clothing.

Collins also told multiple versions of what happened when he returned to the hotel room from Braum's. He told police that he pulled Lee from the bathtub after returning to the hotel. On a jail phone call, he said Lee was on the bathroom floor and appeared yellow when he returned. Later on that call, Collins said he returned from Braum's, brought a coke into the bathroom for Lee, then heard a thump and found Lee on the floor.

Accordingly, considering the heightened recklessness standard under second-degree murder and Collins' lack of evidence to support simple recklessness, we are not firmly convinced that the jury would have reached a different verdict had the district court instructed on involuntary manslaughter.

12

III.    THE STATE DID NOT COMMIT REVERSIBLE PROSECUTORIAL ERROR DURING
        CLOSING

*Standard of Review*

Appellate courts use a two-step process when examining prosecutorial error claims: (1) determine whether error occurred; and (2) if error occurred, determine whether such error prejudiced the defendant. At the first step, courts "analyze whether the prosecutor's acts fell outside the wide latitude afforded prosecutors." *State v. Sean*, 306 Kan. 963, 973, 399 P.3d 168 (2017). At the second step, courts decide "whether the error prejudiced the defendant's due process rights to a fair trial." 306 Kan. at 973. If so, courts employ the constitutional harmless error test to determine whether the State has proven "'beyond a reasonable doubt that . . . there is no reasonable probability that the error contributed to the verdict.'" 306 Kan. at 973; see *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967).

*Analysis*

Collins claims that the State used "we know" statements during closing argument for both contested and uncontested issues. He challenges the following "we know" statements as being unsupported by anything other than witness testimony:

- "We know that we did not—we do not see Nina Lee again until officer Parsons and/or Officer Kepley arrive at the Canterbury Inn and she was not breathing."
- "We know that the defendant is next seen at 10:42 when the maid dropped off some towels to the defendant."
- "We know the defendant is seen leaving the room at 12:42. He goes to the breezeway, returns seconds later, and then goes to the main office."
- "We know he went to Braum's and returns to his room at 1:11."

13

- "We know by the testimony of Detective Queen, and video, that no one other than the defendant entered the room after they got there at 5:49 a.m. on February 15, 2020, until officers arrived at 1:44 p.m., on February 15, 2020."
- "We know [Collins] called 911 at 1:35, over 20 minutes after he returns [to the hotel room]."
- "We know [Collins] tells law enforcement many things, but none of what [Collins] tells law enforcement includes a sock that was found in Nina Lee's airway."

Collins argues that the prosecutor's statement that "we know" nobody else other than Collins entered the hotel room was only supported by Queen's testimony and the jury did not see surveillance footage to confirm that. He takes further exception to the prosecutor's statement that "we know" Collins called 911 over 20 minutes after returning to the hotel room. He submits that nobody could identify him as the 911 caller. Collins finally challenges the prosecutor's statement that "we know" Collins told police many things, but none of that included the sock in Lee's throat. He suggests that this statement asked the jury to infer Collins' guilt from his lack of statement. At trial, Collins did not object to these statements.

Collins asserts that he never confessed to killing Lee, the State presented a weak case based on circumstantial evidence, the cause of death was unknown, and the jury did not see surveillance footage to corroborate the State's timeline. Therefore, he argues, the prosecutorial errors were not harmless.

The State responds that the "we know" statements were about admitted evidence and sworn uncontroverted testimony. Contrary to Collins' claim, the State asserts that it played some surveillance footage during trial and gave the entire video to the jury for deliberations. As to the 911 call, the State says that it played the 911 call during trial and, during a separate call Collins made from jail played during trial, Collins referenced his

14

911 call. As to Collins' lack of statement about the sock, the State asserts that three officers' testimony and Collins' jail phone call show what was and was not said. The State compares this case to *State v. Corbett*, 281 Kan. 294, 315-16, 130 P.3d 1179 (2006) (prosecutor's use of "we know" phrase not improper when referring to uncontroverted evidence).

And the State submits that any error was harmless because each statement was followed with an explanation of supporting evidence. The State also points out that the jury was instructed that statements of counsel were not evidence. The State compares this case to *State v. Alfaro-Valleda*, 314 Kan. 526, 544-45, 502 P.3d 66 (2022) (prosecutor's "we know" statements were error when inferences were required but harmless given evidence against defendant and jury instruction on arguments of counsel).

In this case, the "we know" statements regarding the timeline of who entered or left the hotel room were based on Queen's testimony of that timeline. The State is also correct that the surveillance footage from the Canterbury Inn was played during trial. During Queen's testimony, the footage was admitted as Exhibit 30 and played for the jury. Exhibit 30 includes the footage that showed Collins and the hotel room, while the remaining footage is contained in Exhibit 30A.

Canterbury Inn owner Vinya Gandhi testified that the hotel's security cameras operate on motion sensors. Accordingly, the surveillance footage jumps between times based on when the cameras detected movement. Gandhi said that he was out of town on the day of Lee's death. On cross-examination, Collins questioned Gandhi about whether the security cameras were working properly that day:

> "Q.     So my question is in regards to whatever your surveillance equipment is, you are not there to make sure that it is working properly or anything?
> "A.     No. It is working properly 24/7.

. . . .

"Q.     You are not at the hotel to see if it is working properly; correct?

"A.     I was not at the hotel—I was not at the hotel at that time, but I was—I came back that same night."

On redirect examination, the State asked Gandhi about the hotel's safeguards for its security system:

"Q.     And if someone tampers with the [security] system, do you have any systems in place for you to be able to tell?

"A.     They cannot tamper with the system because the system is inside the office, not outside the office.

. . . .

"Q.     Okay. So if someone had tampered with the system, would you be able to know about that?

"A.     Yes.

"Q.     How is that?

"A.     Because we also have a monitor. So if something happened to the system, we would not even [be able to] watch anything on the monitor."

As noted above, the State insists that the "we know" statement regarding the 911 call was supported by the 911 call itself and Collins' jail phone call where he stated that he called 911. During trial, the 911 call was admitted as Exhibit 1 and played for the jury. During the call, Collins did not identify himself. Neither the 911 operator nor the 911 director could identify the other voice on the call. The 911 director identified the phone number from which the 911 call came, but the State did not produce evidence connecting that phone number to Collins. During a jail phone call—admitted as Exhibit 24—Collins said after he returned to the hotel room from Braum's, he called 911 after finding Lee unresponsive on the floor. Collins said that the person on the 911 call was explaining to him how to do CPR.

16

The "we know" statement regarding what Collins told police was based on the officers' testimony and body cam footage that captured Collins' statements. Parsons testified that Collins told him Lee had been on the floor for about 10 minutes. Collins told Parsons that he had walked to Braum's, returned to the hotel room, and found Lee on the floor. Parsons' body cam footage showed Collins making three statements about what happened to Lee. The footage first showed Collins kneeled over Lee's body on the floor when he told Parsons that he walked to Braum's and came back; his voice then trailed off. Parsons' footage next showed Collins giving a statement to Kepley that he and Lee got in an argument, he went to Braum's, returned to the hotel room, and pulled Lee out of the bathtub. Finally, Parsons' footage showed Collins giving the same statement he gave to Kepley; after explaining his return to the hotel from Braum's, Collins said "that was it" without further detail.

As noted above, Collins told Kepley that he and Lee got in an argument, he left to get something to eat, he returned to the hotel room, and then he found Lee and pulled her out of the bathtub. Officer Jeremy Ewan's body cam footage showed Collins telling a paramedic that he found Lee in the bathtub.

*Prosecutors' use of "we know" statements in Kansas*

In Kansas, "a prosecutor's use of 'we know' is acceptable when it 'does not indicate [the prosecutor's] personal opinion, but demonstrates that the evidence was uncontroverted.'" *State v. King*, 308 Kan. 16, 34, 417 P.3d 1073 (2018). Prosecutors may not use "'we know'" statements to draw inferences for the jury, "even if the inferences being drawn were reasonable." 308 Kan. at 34.

As noted above, the State compares its use of "we know" statements to *Corbett*. There, Corbett challenged the prosecutor's use of "we know" statements during closing argument as injecting his opinion on the evidence. The Supreme Court found that each

17

time the prosecutor used "'we know,'" he referred to "uncontroverted evidence" and found the statements were "not improper." 281 Kan. at 315-16.

Our Supreme Court has on occasion found prosecutors' use of "we know" statements to be prosecutorial error. For example, in *King*, the prosecutor used "'we know'" statements when arguing (1) King's gloves were the same gloves seen on surveillance footage during multiple robberies; (2) King was at a robbery location because the blood of an employee was on King's boot; and (3) King shared the money from the robberies with an accomplice. The court found that all of these statements drew inferences rather than stating uncontroverted evidence. 308 Kan. at 34.

In *Alfaro-Valleda*, a jury convicted Alfaro-Valleda of first-degree premeditated murder based on circumstantial evidence and Alfaro-Valleda's statement to police. During closing argument, the prosecutor used "we know" statements multiple times. The prosecutor first stated that "we know" the shooter was Alfaro-Valleda because the victim called his girlfriend and reported being followed by a truck. 314 Kan. at 542. The prosecutor then said "we know" Alfaro-Valleda was following the victim because he drove the same kind of vehicle as the one following the victim. 314 Kan. at 542. The prosecutor then conveyed that because the victim was shot multiple times, "we know" both that Alfaro-Valleda had a gun and Alfaro-Valleda's "'conscious objective'" was to shoot the victim. 314 Kan. at 543. The prosecutor also claimed that "we know" Alfaro-Valleda's gun contained .380 caliber ammunition because that was the ammunition found at the scene. 314 Kan. at 543. The Supreme Court found all of these statements to be prosecutorial errors for improperly asking the jury to draw inferences. 314 Kan. at 543.

Later, in *State v. Brown*, 316 Kan. 154, 168, 513 P.3d 1207 (2022), the Supreme Court again found the use of "we know" statements to be prosecutorial error. There, the prosecutor used "we know" statements regarding the location of cellphones, DNA evidence, and Brown allegedly repeatedly shooting from the passenger seat of a car. The

*Brown* court found these statements improper because "[e]ach statement related to a contested point, and each required the jury to draw inferences." 316 Kan. at 167.

*We review the prosecutor's "we know" statements.*

In this case, the prosecutor's "we know" statements regarding the timeline and activity around the hotel room were comparable to the inferences required in the prosecutors' statements in *King*, *Alfaro-Valleda*, and *Brown*. It is true that these "we know" statements were supported by Queen's testimony and the surveillance footage played during trial. However, the surveillance footage jumps in time based on when the cameras detected movement. Queen's testimony was based on that footage. Collins questioned Gandhi about whether the security system was working on the day of Lee's death. Therefore, his questioning on Gandhi's cross-examination tried to put the reliability of the hotel's security system into question.

Another panel of this court recently found prosecutorial error for a "we know" statement under similar circumstances. See *State v. Kellner*, No. 125,086, 2024 WL 208192, at *17 (Kan. App.) (unpublished opinion) (finding "we know" statement referring to DNA evidence improper where the defendant attempted to elicit testimony putting such evidence into question), *rev. denied* 318 Kan. 1088 (2024). Accordingly, the prosecutor's "we know" statements here regarding the timeline and activity around the hotel room required an inference that the hotel's security system was working properly that day; thus, the statements were error.

Furthermore, the prosecutor's "we know" statement regarding the 911 call is also comparable to *King*, *Alfaro-Valleda*, and *Brown*. As Collins asserts, neither witness involved with the 911 call identified Collins as the caller. A reasonable juror could have inferred that Collins was the caller based on the address provided and the nature of the emergency, as well as Collins' mention of his 911 call during his jail phone call. But

19

Collins was never definitively identified as the caller of the 911 call played at trial. A "we know" statement requiring inferences is improper even if those inferences are reasonable. *King*, 308 Kan. at 34. Therefore, the prosecutor's statements regarding the timeline and activity around the hotel room and the 911 call fell outside the wide latitude afforded to prosecutors.

The prosecutor's statements regarding Collins' statements to police are distinguishable from *King*, *Alfaro-Valleda*, and *Brown*. These statements were supported by testimony from Parsons, Kepley, and Ewan, along with their body cam footage. Collins did not argue at trial that he told police about the sock in Lee's throat. Although Collins argues that this statement asked the jury to infer guilt from his lack of statement, prosecutors are allowed to comment on a defendant's silence before being given warnings under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). *State v. Fisher*, 304 Kan. 242, 249, 373 P.3d 781 (2016). Prosecutors are also "permitted to comment on inconsistencies in a defendant's statements." *State v. Carter*, 305 Kan. 139, 156, 380 P.3d 189 (2016). We find the prosecutor's "we know" statement on Collins' statements to police did not fall outside the wide latitude given to prosecutors.

*Harmlessness*

We next consider whether the prosecutor's "we know" statements regarding the timeline and activity around the hotel room and the 911 call were both individually and collectively reversible. If prosecutorial error is established, appellate courts determine whether the State has shown "'beyond a reasonable doubt that . . . there is no reasonable possibility that the error contributed to the verdict.'" *Sean*, 306 Kan. at 973; see *Chapman*, 386 U.S. at 24.

Here, the prosecutor's "we know" statements about the 911 call and the timeline and activity around the hotel room were inferences based on the exhibits and testimony

20

presented during trial. The surveillance footage and testimony presented at trial suggested that Collins was the only person to enter and exit the hotel room. And, as explained, Dr. Hossain testified that Lee could not have pushed the sock down her throat on her own.

After finding multiple instances of prosecutorial error in a case based on circumstantial evidence, the *Alfaro-Valleda* court found each statement individually harmless. The court highlighted that the prosecutor followed up each statement with supporting evidence. The court also pointed to the jury instruction stating that statements of counsel are meant to help understand evidence but are not themselves evidence. The court found the statements cumulatively harmless, noting the jury instruction on statements by counsel and Alfaro-Valleda's statement to police where he implied that he killed the victim. 314 Kan. at 544-45. The *King* and *Brown* courts reached the same conclusion. See *King*, 308 Kan. at 35; *Brown*, 316 Kan. at 170-72.

Similarly, the jury here was instructed that counsel's statements were not evidence. The district court issued the following jury instruction: "Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and in applying the law, but they are not evidence. If any statements are made that are not supported by evidence, they should be disregarded." Thus, the jury did receive an instruction to disregard statements that were "not supported by evidence."

Furthermore, the "we know" statement referring to the 911 call required an inference that Collins made the 911 call requesting emergency assistance for a methamphetamine overdose at the Canterbury Inn five minutes before police arrived at his hotel room. The "we know" statements regarding the timeline inferred that the Canterbury Inn's security system was functioning properly that day. These are reasonable inferences. Additionally, the prosecutor pointed to evidence shown in witness testimony, the 911 call audio, and the surveillance footage with each "we know" statement. Each statement was therefore supported by evidence in the record. Accordingly, we find the

prosecutor's statements were individually harmless. Moreover, because the prosecutor's "we know" statements concentrated on individual evidentiary questions, we conclude that the statements collectively had no effect on Collins' trial.

In considering the cited cases, *Alfaro-Valleda* and *King*, and additional evidence suggesting that Collins was responsible for Lee's death, we conclude beyond a reasonable doubt that the prosecutor's improper "we know" statements did not contribute to the verdict.

IV.    CUMULATIVE ERROR DID NOT DEPRIVE COLLINS OF HIS RIGHT TO A FAIR TRIAL

*Standard of Review*

Cumulative trial errors, when considered together, may require reversal when the totality of the circumstances establishes that the defendant was substantially prejudiced by the errors and denied a fair trial. When examining the cumulative effect of trial errors, appellate courts look at the errors in context and consider how the district court dealt with the errors as they came up, the nature and number of errors and whether they are interrelated, and the overall strength of the evidence. If any errors are constitutional, the benefitting party must show "'beyond a reasonable doubt that the cumulative effect of the errors did not affect the [trial's] outcome.'" *Alfaro-Valleda*, 314 Kan. at 551-52. Cumulative error "does not apply if there are no errors or only a single error." *State v. Gallegos*, 313 Kan. 262, 277, 485 P.3d 622 (2021).

*Analysis*

Collins contends that related prosecutorial errors deprived him of a fair trial and that an instructional error prevented the jury from considering an involuntary

22

manslaughter verdict. He submits that the State cannot prove beyond a reasonable doubt that these errors were harmless.

The State counters that any errors are not connected "and simply cannot logically cumulate in a way [that] requires reversal of Collins' convictions." The State suggests that it is questionable whether an unpreserved error can be included in a harmless error analysis because the clear error standard for instructional errors conflicts with the harmless error standard of cumulative error.

The trial errors in this case consisted of prosecutorial error for using "we know" statements that required inferences and an instructional error that can be deemed harmless. As noted above, the erroneous "we know" statements were individually and collectively harmless. Additionally, the Kansas Supreme Court recently held that "[u]npreserved instructional issues that are not clearly erroneous may not be aggregated in a cumulative error analysis because K.S.A. 2022 Supp. 22-3414(3) limits a party's ability to claim them as error." *State v. Waldschmidt*, 318 Kan. 633, Syl. ¶ 9, 546 P.3d 716 (2024). Consequently, the only errors that can be discussed as cumulative error are the prosecutorial erroneous statements. As already noted, those errors were harmless. Thus, cumulative error did not deprive Collins of a fair trial.

V.      THE DISTRICT COURT ERRED IN SENTENCING COLLINS

Collins argues on appeal that the district court erred by using his C criminal history to calculate his nonbase sentence for his conviction of interference with law enforcement. He states that the district court should have applied a criminal history score of I to his nonbase sentence.

*Standard of Review*

An illegal sentence is a sentence that: (1) is imposed by a court without jurisdiction; (2) is contrary to the applicable statutory provisions; or (3) is ambiguous about the time and manner in which it is to be served. K.S.A. 22-3504(c)(1). An illegal sentence claim is a question of law subject to unlimited review. Likewise, statutory interpretation is also subject to unlimited review. *State v. Johnson*, 317 Kan. 458, 461, 531 P.3d 1208 (2023).

*Analysis*

When a defendant is convicted of multiple crimes, the base sentence is determined by the primary crime. "The primary crime is the crime with the highest crime severity ranking." K.S.A. 21-6819(b)(2). Once the primary crime is determined, the base sentence for the primary crime "is set using the total criminal history score assigned." K.S.A. 21-6819(b)(3). The remaining sentences are not calculated according to the defendant's criminal history score. Instead, "[o]nly a criminal history score of 'I,' which signifies no criminal history, is used to determine any nonbase sentences." *State v. Fowler*, 311 Kan. 136, 143, 457 P.3d 927 (2020); see K.S.A. 21-6819(b)(5). The *Fowler* court reaffirmed the requirement to sentence a defendant under a criminal history score of I for a nonbase sentence under the current sentencing statutes. 311 Kan. at 143.

Collins' primary crime was his second-degree reckless murder conviction, a severity level 2 person felony. K.S.A. 2019 Supp. 21-5403(b)(2). His conviction for interference with law enforcement under K.S.A. 2019 Supp. 21-5904(a)(1)(C) is a severity level 9 nonperson felony under K.S.A. 2019 Supp. 21-5904(b)(2) and is a nonbase conviction.

Collins contends that the district court should have sentenced him according to the I criminal history column because interference with law enforcement, as a less severe crime than second-degree reckless murder, would be a nonbase sentence.

As Collins points out, during sentencing, the district court correctly said Collins' criminal history for the interference with law enforcement conviction was I. The presentence investigation (PSI) report listed Collins' criminal history for interference with law enforcement as I but then listed the sentencing range as 13, 12, or 11 months. Due to this error on the PSI report, the court announced the sentencing range as 13, 12, or 11 months, and then sentenced Collins to 12 months for the interference with law enforcement conviction. The journal entry of sentencing reflected this same sentence.

This is not the correct sentencing range that corresponds to a criminal history of I for a severity level 9 nonperson felony offense. The sentencing range corresponding to a criminal history score of I would have been seven, six, or five months. K.S.A. 2019 Supp. 21-6804(a). Because K.S.A. 2019 Supp. 21-6819(b)(5) states that a nonbase sentence must be calculated using a criminal history score of I, the district court should have instead sentenced Collins to seven, six, or five months. See K.S.A. 2019 Supp. 21-6804(a).

Collins' sentence violates the applicable statutes, and we remand for resentencing according to the correct sentencing range for a criminal history of I for the interference with law enforcement conviction. The State concedes this issue, stating that the district court erred in sentencing Collins. The State says this was because of an error in the PSI report for this conviction. We agree and remand for resentencing. See *State v. Starr*, 259 Kan. 713, 723-24, 915 P.2d 72 (1996).

Affirmed in part, sentence vacated in part, and case remanded for resentencing.